## In re PATTERSON'S WILL.

(*Supreme Court, General Term, First Department.* February 11, 1891.)

1. Wills—Testamentary Capacity.

A will should not be denied probate on the ground that there was a lack of testamentary capacity, merely because testator was so weak physically that he could only make his mark, especially when the subscribing witnesses, both of whom were disinterested, declared that testator was entirely rational, and none of the other witnesses observed anything tending to show that testator did not understand what he was doing.

2. Same—Undue Influence.

A finding that the execution of a will was procured by undue influence cannot be sustained where the evidence shows that testator was in perfect possession of his faculties, that the difference between the will attacked and one made the previous day, about which there was no complaint, was very slight, and made at the reasonable request of a natural residuary legatee, without any undue persuasion or subjection of the will, and that no complaint was made of the will by any one dependent upon testator's bounty.

Appeal from surrogate's court, New York county.

This is an appeal by George W. Patterson and Eliza Brogan, refusing probate of the last will and testament of John Patterson, deceased, on the ground of undue influence exercised by said George W. Patterson.

Argued before Van Brunt, P. J., and Bartlett and Barrett, JJ.

*Henry Hoyt*, for appellant George W. Patterson. *Christian G. Moritz*, for appellant Eliza Brogan. *William G. Choate*, (of counsel,) for appellants. *Charles H. Beckett*, for respondents.

Barrett, J. There seems to have been some misunderstanding in this case with regard to the terms of the decree appealed from. The learned surrogate in his opinion expressly placed his judgment upon the fact that the paper offered for probate "was not the free and voluntary, unrestrained act of the deceased." He did not intimate a doubt as to the due execution an

attestation of the instrument, nor did he express a decided opinion upon the question of testamentary capacity. On the contrary, he made the following observations upon the latter head: "Whether the testator was actually capable, at the time he executed the paper, of executing a will under the very liberal construction of our statute which the courts have given, and which I have been compelled to follow in several cases, it is not necessary for me to decide. Not very much evidence has been given on that point. That the man was in a desperately sick condition, very near to death, with a very. limited testamentary capacity, and very limited mental strength, is established to my satisfaction by the evidence of Mr. Hoyt, without reference to the evidence of any other witness in the case." The learned surrogate added that, although he might be justified on the proof in holding that there was not mental capacity, he preferred "to dispose of the case upon the other proposition," namely, undue influence. The decree nevertheless adjudges, in addition to the finding of undue influence, that the will was not executed or attested in the manner prescribed by law for the execution and attestation of last wills and testaments, and that the testator was not competent to execute the same. We find no evidence in the case to support the finding with regard to the execution of the instrument, and, as the question was not adverted to in the opinion, we assume that the error was that of the draughtsman, and that the form of the decree was not minutely scrutinized. There certainly was ample evidence of the execution of the will in the manner prescribed by law. The testimony of the subscribing witnesses was sufficient, and it was not in any way shaken.

As to the question of testamentary capacity, we do not entertain the doubt expressed by the learned surrogate. It is true that the testator was very ill and very weak, but the proof of his mental capacity was quite sufficient. This instrument was executed on the 19th day of April. On the 18th of the same month the testator executed another will, which was admitted to probate on the application of the present contestants. His mental capacity when he executed the first will is not questioned, and while it is evident that the testator was nearing his end, and becoming physically weaker day by day, his mental capacity was not destroyed nor materially affected within the next 24 hours. Indeed, the mental power which he exhibited on the 19th seems to have been as great as that shown on the 18th. He told the lawyer who drew the instrument that he was not satisfied with the will of the day before, and that he wished it changed. He also told this lawyer "to whom the different amounts were to be given." The will was read to him before it was executed, and, although he was so weak physically that he could only make his mark with assistance, the subscribing witnesses, both of whom were apparently disinterested, declared that mentally he was entirely rational. Indeed, one of them stated that the testator was as clear as he (the witness) and the learned surrogate were when the testimony was being given. None of the witnesses observed any irrational acts, or anything tending to show that the testator was unable to comprehend the business attending the making of his will.

Upon the question of undue influence, the learned surrogate rests his opinion mainly upon the fact that the proponent, George W. Patterson, employed the lawyer who prepared the instrument, and exhibited much excitement with regard to its hasty execution. He was determined, the respondents insist, to have it done. There are several salient facts in this case which lead us to differ with the conclusion thus arrived at. In the first place, George W. Patterson and his sister Eliza Brogan were the testator's only heirs at law and next of kin. They were the natural recipients of his bounty. By the will of the 18th of April, as to which there is no pretense of undue influence, the testator gave this sister the income of $10,000 for life, and upon her death the principal sum was given to George W. Patterson. He the

gave the income of $5,000 to his niece Louisa Brogan for life, and upon her death the principal sum was also given to this brother; and, after giving certain legacies to other parties, he made this brother his residuary legatee. The difference between the disposition of property in this will and in that made the next day was so slight that it is difficult to perceive any motive for undue influence. Eliza Brogan's rights are substantially the same in the later instrument. So are Louisa's. The legacy to Daniel Paxton, who is one of the executors named in both wills, is increased by $500. That to James B. Hackett, who was named as an executor in the first will, but not in the second, is decreased from $4,500 to $1,000. The legacy of $1,500 to Daniel Kelly, the son of one of the testator's friends, remains the same, and the only change with respect to that legacy is that it is made payable immediately. The residuary legatee, George W. Patterson, is thus a gainer by the second will to the extent of but $3,000 from an estate showing $64,000 of personalty, besides a house and lot in this city. The substantial complaint seems to be that Mr. Hackett has lost $3,500 of his original legacy, and also his executorship. No one dependent upon the testator's bounty comes forward to make any complaint. The testator's property has gone in a natural channel, substantially as he desired even when acting in the absence of his brother, and the whole trouble seems to have arisen from Mr. Hackett's unwillingness to permit this brother to administer upon the estate jointly with Mr. Paxton. When George W. Patterson learned the contents of the first will, he expressed to the testator a desire to be made an executor. This desire was perfectly natural, and its expression was entirely proper, under the circumstances. Who, indeed, should have a voice in the administration, if not the man who was to receive the great bulk of the estate? It is no wonder that he was excited upon learning that, although he was the principal legatee, he was not named as executor, and was thus deprived of the ordinary protection to his rights which would be afforded by his having a share in the administration. He did not request his brother to make him sole executor. He simply asked to share that office with one of the gentlemen named as executors in the first will. He does not appear to have been responsible for the cutting down of Mr. Hackett's legacy. Even as to the executorship, there was no threat, no undue persuasion, no subjection of the will, no overpowering influence exercised upon a weak mind, none of the usual *indicia* of undue influence. There was in fact no need of undue influence. The simple request of a natural residuary legatee was sufficient to effect the slight and reasonable changes made in the first will. There is, in truth, nothing in the trivial facts of this case to bring it within the most extreme view of undue influence taken in any of the authorities. What relevancy the incident of the diamond pin has to support the charge of undue influence we cannot imagine. The testimony of one of the subscribing witnesses with regard to this incident is as follows: "George W. Patterson said to his brother, ' You have a diamond pin.' It was on his under-shirt; on the testator's flannel shirt. It was a large diamond pin, perhaps as large as my first finger nail. It was quite brilliant. George W. Patterson then said: ' You promised to give me that pin.' In the mean time Mrs. Gahill flew down in front of him. She said: ' You shan't give him that pin; you promised it to me.' So they didn't either one get it. Then the testator—who was then in a dying condition—waived them both away, and with a curse, ' To hell with you;' or something like that." This would seem to indicate anything but subjection on the part of the testator. It exhibited greed on the part of George W. Patterson and Mrs. Gahill, but not control. If it exhibits anything but greed, it is entire absence of any overmastering influence. It was an inaccurate view of the evidence to speak of this effort on George's part to possess himself of this pin as "a disgraceful and horrid attempt to remove by force a jewel from the shirt of his brother." No force was used, and even persuasion failed. The

incident was exaggerated, and should not have been treated as in any sense crucial. Upon the whole, we think ;this will should have been admitted to probate, and therefore the judgment appealed from should be reversed, and an order made directing a trial by jury in the court of common pleas of the material questions of fact arising upon the issues between the parties; the issues to be framed upon notice.

VAN BRUNT, P. J., concurs.

BARTLETT, J.  I concur in the result.