(42 App. Div. 481.)

# In re DIXON'S WILL.

(Supreme Court, Appellate Division, Fourth Department. July 18, 1899.)

1. WILLS—MENTAL CAPACITY.

　　The fact that testator was an old man, and in feeble condition of body and mind, is not sufficient to justify an inference of want of testamentary capacity.

2. SAME.

　　The fact that testator was weak, and could only make his mark with the assistance of the subscribing witnesses, does not show incapacity to execute a will.

3. SAME—UNDUE INFLUENCE.

　　The fact that there was opportunity to exercise undue influence, and a motive, is not sufficient to avoid a will if the same was the result of testator's independent action.

4. SAME—QUESTION FOR JURY.

　　Where the evidence at the probate of a will of an old man tends to show that it was the result of undue influence, and it is in opposition to his often-declared intention, and there is evidence of an opportunity to exercise undue influence, and that testator was feeble, both in mind and body, the question of undue influence and incapacity should be submitted to the jury.

Appeal from surrogate's court, Jefferson county.

Smith T. Woolworth, executor, presents the last will of Henry Dixon for probate. From a decree admitting it to probate, Theodore E. Hancock, attorney general, and the people, appeal. Reversed.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, SPRING, and NASH, JJ.

Elon R. Brown, for appellants.

John Lansing, for respondent.

HARDIN, P. J. Henry Dixon, the testator, a colored man, died on the 25th day of February, 1898, in the city of Watertown, at the age of a little more than 80 years, leaving personal and real estate. In the petition for the probate of the will it is stated by the executor that the personal estate does not exceed in value $1,000, and that the real estate "does not exceed in value $8,000." The petition filed by the executor stated:

"That the heirs and next of kin, and legatees, devisees, trustees, and executors of the said deceased are as follows, and none other or others, to the best knowledge, information, and belief of your petitioner, viz.: James Carlisle Brooks, a son, last heard of at Frederick county, Maryland; Mary Elizabeth Brooks, a daughter, last heard of at Frederick county, Maryland; Francis Henry Brooks, a son, last heard of at Frederick county, Maryland."

The petition further states, viz.:

"Your petitioner further shows that it is many years since said children of the testator, James, Francis, and Mary Brooks, were heard from; that they were born in slavery, and, if living, are now over fifty years old, as your petitioner is informed and believes."

The petition was filed on March 7, 1898. A citation was issued, directed to the children already mentioned, and to the attorney general, and to Franklin M. Parker, county treasurer, returnable on the 25th of April. On that day the attorney general and the people of

the state filed objections to the proposed probate of the will of the deceased, which objections were as follows:

"(1) That the said paper is not the last will of the said decedent, and that the alleged execution thereof was not his free, unconstrained, and voluntary act; (2) that neither at the time said paper purports to have been executed, nor at any time when it was executed, was he of sound mind, memory, and understanding; (3) that the said paper was not subscribed, published, and attested as and for his last will, in conformity with the statute in such case made and provided."

After hearing the evidence offered by the respective parties, the surrogate made a decision in writing, wherein he found, viz.:

"First, that said will was duly executed; second, that Henry Dixon, at the time of the execution of the last will and testament offered for probate in this proceeding, was competent to make a will, and possessed of testamentary capacity; third, that he was not unduly influenced, or under any restraint."

On the 10th day of February, 1898, the testator made his mark in evidence of the execution of his will in the presence of James A. Ward and Joseph Snyder, who became subscribing witnesses, which will, among other things, contained a direction for the payment of the testator's debts and funeral expenses, and—

"Second. After payment of all debts as aforesaid, I hereby give, devise, and bequeath to each of my children, Mary Elizabeth Brooks, James Carlisle Brooks, and Francis Henry Brooks, the sum of one thousand dollars each, to be paid to them, and each of them, out of the proceeds of my estate, if they can be found within four years. Third. The rest, residue, and remainder of my estate, both real and personal, of whatever name or nature, I hereby give, devise, and bequeath to James Bellew, one of the trustees of the society of St. Patrick's Church of Watertown. Fourth. In case any or all of my said children be dead, or cannot be found within four years, then, and in that event, the sum hereinbefore given to each or all of said children I hereby give, devise, and bequeath to said James Bellew absolutely. I hereby empower my executor hereinafter named to execute any deeds or conveyances, and sell and dispose of any and all real estate I may own at time of my decease. I hereby revoke all former wills by me made. Lastly. I hereby appoint Smith T. Woolworth, of Watertown, N. Y., executor of this, my last will and testament, hereby revoking all former wills by me made."

From the evidence it appears that the testator was a slave before the breaking out of the Rebellion, and that by way of "the underground railway" he escaped into Canada, and while he was there he married a white woman, who was a Roman Catholic. About the time the war broke out, he removed to the city of Watertown, where he resided up to the time of his death, and where he accumulated the property which he left. Throughout his life after leaving slavery he seemed to have active religious tendencies. His wife was a member of the Roman Catholic Church, and he occasionally attended services with her, and attended upon missions which were held in that church. At the same time he professed to be a Methodist, and was a member, and quite prominent for a number of years, of the Arsenal Street Methodist Church; and in the later years of his life he became interested in the work of foreign missions, and a moving spirit in the establishment and erection of the Bethany Chapel, a mission of the Methodist Church. He solicited subscriptions in aid of the erection of the chapel, and subscribed therefor $200, and he illustrated his interest in the Bethany Chapel by providing it with a bell, and he was

a steward of the church, and acted as chairman of the board of trustees up to the time of his death. For some four years he was a member of the Bethany Church, and attended the services with commendable regularity, most of the time twice every Sunday, and attended many week-day meetings, until his health began to fail. His last attendance upon Bethany Church was about a month before his death. He was on very familiar and friendly terms with the Reverend Mr. Dorr, the pastor of Bethany Church, and with Mr. Baker, the leader of his class, and other members of the church. Dorr, Baker, and other members of the church were frequent visitors at his house, and they read to him, and conducted prayer and singing exercises in his presence, and conversed in respect to the affairs of the church in general. After he became so feeble that he could not get to the church, he requested Mr. Baker to call on him, and he stated to the Reverend Mason Jones that he was fond of the Reverend Mr. Dorr, and that he made a good pastor, and that he intended to make efforts to increase his salary. The white woman whom he had married in Canada, and to whom he was remarried by the Catholic priest after he had reached Watertown, lived with him until the time of her death, which occurred some three years prior to his. They had no children. She was buried in the Catholic cemetery, in a lot which he purchased for that purpose. Subsequent to her death, he lived alone in a house on Binnse street,—a part of a double house, the other portion of which was occupied by a French Catholic by the name of Napoleon Lackalien. According to the testimony of Father Glenn, the Catholic priest in charge of St. Patrick's Church, he had several interviews with the deceased in the summer months of July and August preceding his death, and he called upon the deceased on the 7th of February of his own free will, and held a conversation with him, and then made an appointment, according to the request of the deceased, to come the next day but one; and, according to that request, on the 9th of February, he visited the deceased, who had told him that he would then be prepared to be received into the church. The witness Glenn testifies: "On the 9th I went over, according to his wishes. I heard his confession, gave him the sacrament of penance, and I baptized him conditionally." The deceased informed the priest that he should desire to receive the other sacraments, and the priest told him to prepare himself, and he would come over in a few days, and give him all the sacraments. On the next day—the 10th—the priest again saw the deceased, having been requested by messenger to call upon him, the messenger having stated that the deceased desired to see the priest. In respect to that interview the priest testifies as follows:

"I went over, and found him sitting in a chair. It was before dinner. I asked him if he was feeling worse, and he said he was. I gave him the other sacraments of the church,—the holy eucharist while he was sitting in his chair, and the extreme unction when he went to bed, and the final indulgence. He told me that he had tripped on the carpet during the night, and had fallen on his lame side, and had lain on the floor all night. He said he lay there until morning, when Mr. Lackalien came in, and picked him up. He did not mention that he had been asleep. He said he had been chilled. He felt chilly. Had caught cold. He requested me, when I got through with him, to send over a doctor and a lawyer; and I got word to Dr. Barnett and Mr. Ward to

go over there. He did not tell me on that occasion what he wanted a lawyer for when he sent me after them. * * * Before I sent the lawyer over there, Mr. Dixon didn't talk to me about his will,—that he wanted to make a will. He never said a word to me about it until the occasion when he was about to make it, when I introduced Mr. Ward to him. When we arrived there, the doctor went in, and examined him, prescribed for him, and when he finished his services I called Mr. Ward in from the other room—from the front room— into the bedroom, and introduced him to Mr. Dixon, and told him that he was a lawyer, and then Mr. Dixon spoke out, and said that he wanted to make a will. That was the first I had ever heard about his making a will; that is, that is the first I ever said to me. I have heard of will and all that, but personally that was the first occasion on which he expressed to me that he wanted to make a will, then and there; and he opened the conversation, and said he wanted to leave something to his children; and I suggested that he ought to leave them four hundred dollars apiece."

After the lawyer arrived, and was closeted with the deceased, there appeared on the scene the Reverend Mr. Dorr, who held some conversation with Father Glenn, and the testimony in respect to just what transpired in their interview is somewhat conflicting. It discloses, however, that there was an altercation between the reverend Methodist gentleman and the reverend Catholic gentleman in respect to the deceased, and in regard to their respective religions. The interview was terminated by the withdrawal of Mr. Dorr, and the lawyer continued to prepare the will, which was executed just after the altercation transpired between the two reverend gentlemen. The evidence discloses many circumstances and events attending the interviews held with the deceased by Father Glenn and the lawyer who prepared the will, not necessary to be recapitulated in detail at this point. Before the 10th of February the deceased had become very much enfeebled in his physical condition, having previously had "a stroke" of paralysis. There was a conflict in the evidence as to whether he had had a second attack of paralysis on the night of the 9th. The evidence indicates that the deceased tripped and fell, and was unable, on account of his partial paralysis, to arise, and that he lay on the floor until the morning of the 10th. His physical and mental condition during the morning of the 10th and the afternoon when the will was executed is the subject of much conflict in the evidence. After the will was executed, the testator made several declarations in respect to the contents of the will. Some of them were consistent with the terms of the will, and some of them were in conflict with the terms of the will. He continued in life until the 25th of February, and, according to the evidence, some days he was in a fair condition and other days he was very much debilitated, and some of the evidence would indicate that he was delirious. He had, previous to the 10th of February, made three wills. One of them was drawn by Mr. Goodelle, and that contained provisions very unlike the one that is the subject of probate. None of them contained any provision for his children.

According to the testimony given before the surrogate, it must be assumed that the formal execution of the will was in accordance with the provisions of the statute. Simply because the testator was an old man, and in feeble condition of body and mind, is not sufficient to justify an inference that he did not have testamentary capacity. Horn v. Pullman, 72 N. Y. 269; In re Snelling, 136 N. Y. 515, 32

N. E. 1006. The mere fact that the testator was weak physically, and that he could only make his mark with the assistance of others, who became subscribing witnesses, does not of itself show an incapacity on his part to execute a will. In re Patterson's Will (Sup.) 13 N. Y. Supp. 463. The mere fact that there was opportunity to exercise undue influence, and a motive for the exercise of such influence, is not sufficient to avoid the testator's will, provided the same was the result of his independent action in that regard. In re Smith, 95 N. Y. 516. It was said in Re Smith, supra, that "undue influence, which is a species of fraud, when relied upon to annul a transaction inter partes, or a testamentary disposition, must be proved, and cannot be presumed." This will can, however, be avoided on the ground of undue influence if it is established by the evidence that it was obtained by means of influence amounting to moral coercion, and the free agency of the testator was destroyed by importunities which he could not resist, or that he was constrained to do that which was against his actual will, which he was unable to refuse, or too weak to resist. Society v. Loveridge, 70 N. Y. 387; In re Martin, 98 N. Y. 193. It is said in Jarm. Wills, 142, viz.:

"An influence may often be obtained through practicing on the religious beliefs and fears of a party. The courts are very jealous of an influence exerted through this channel."

In the course of the opinion delivered in Marx v. McGlynn, 88 N. Y. 370, it was said:

"Undue influence may be exercised by physical coercion, or by threats of personal harm and duress, by which a person is compelled, really against his will, to make a testamentary disposition of his property. That kind of undue influence can never be presumed. It must be shown by evidence legitimately proving the facts, and where it is established the will cannot be admitted to probate, for the reason that it is not the will of the testator. There is another kind of undue influence more common than that just referred to, and that is where the mind and the will of the testator have been overpowered, and subjected to the will of another; so that, while the testator willingly and intelligently executed a will, yet it was really the will of another, induced by the overpowering influence exercised upon a weak or impaired mind. Such a will may be procured by working upon the fears or the hopes of a weak-minded, person, by artful and cunning contrivances, by constant pressure, persuasion, and effort, so that the mind of the testator is not left free to act intelligently and understandingly."

Whether such influence was exercised as is mentioned in the quotation which we have made depends upon a consideration of all the evidence bearing upon the subject presented in the appeal book. A perusal of the testimony of the two reverend gentlemen who were at the house of the deceased on the occasion of the preparation of his will, in connection with the testimony given by the lawyer who drafted the will, and the testimony of the physician, who detailed his physical condition, and the testimony of the attendants, who narrated the condition of body and of mind that the deceased was in just before the will was executed, and shortly thereafter, leave doubt in the mind as to whether the will was the product of an independent, intelligent understanding on the part of the testator. We think the case therefore ought to be submitted to a jury to de-

termine the questions which arise upon the evidence found in the appeal book.

In Re Van Houten, 11 App. Div. 211, 42 N. Y. Supp. 921, a rule was laid down which we think is applicable to the case before us. It was there said:

"The disposition which should be made of the questions of fact presented by the evidence is not free from doubt, and, as the result reached by the court below is not entirely satisfactory, the case should have reconsideration by a jury;" citing In re Ellick's Will, 19 Wkly. Dig. 231.

The doctrine which we have just quoted was referred to with approval in Re Brunor, 21 App. Div. 265, 47 N. Y. Supp. 685. In the course of the opinion it was said:

"Within the rule above referred to, the evidence raises a doubt as to whether this was the free and voluntary act of the testatrix, sufficiently strong and well founded to call for a reversal of the decree of the surrogate."

Much evidence was given upon the hearing before the surrogate to which we have not referred in detail, which has received consideration, and we are, however, of the opinion that questions of fact should be settled and determined upon a trial before a jury. We therefore shall reverse the decree of the surrogate, and order a trial at the trial term of the supreme court held in the county of Jefferson, of the questions: (1) Did decedent, Henry Dixon, at the time of the execution of the will in question of the date February 10, 1898, have testamentary capacity? (2) Was the instrument purporting to be his will voluntarily made by him? (3) Was the execution by the decedent of the instrument of February 10, 1898, purporting to be his last will and testament, procured by fraud, circumvention, or undue influence practiced upon him? We think the costs of the appeal should abide the event of the new trial, and be payable out of the estate. In re Van Houten, 11 App. Div. 211, 42 N. Y. Supp. 919.

Decree of the surrogate's court reversed, and a new trial by a jury at a trial term to be held in Jefferson county is directed of the questions stated in the opinion, with costs of this appeal to abide the event of a new trial, payable out of the estate. All concur.