<hr />

(71 App. Div. 1.)

In re STAPLETON'S WILL.

(Supreme Court, Appellate Division, First Department. April 11, 1902.)

1. CODICIL TO WILL—PROBATE—EXECUTOR—RIGHT TO APPEAL.
   Under Code Civ. Proc. §§ 1294, 2568, providing that "a party aggrieved may appeal," an executor may appeal from a judgment of the surrogate refusing probate to a codicil.

2. SAME—UNDUE INFLUENCE—SUBMISSION TO JURY.
   Testatrix, who was on her deathbed, and very weak, was supported in bed while she signed a codicil to her will. Her husband, in whose favor the codicil was made, had been with her constantly during her illness. She had previously expressed a desire to change her will as done in the codicil, and her attorney and physician, who were subscribing witnesses thereto, testified that she was not under any restraint or duress at the time. Held, that the question of undue influence should be submitted to a jury.

75 N.Y.S.—42

**8. SAME—MENTAL CAPACITY OF TESTATRIX.**
Evidence examined, and *held* to require submission of the question of testatrix's mental capacity to execute a codicil to her will to a jury.
Laughlin, J., dissenting.

Appeal from surrogate's court, New York county.

Proceedings for the probate of the will of Eliza Stapleton, deceased. From a decree of the surrogate's court of the county of New York refusing probate to an alleged codicil to the will, Patrick Stapleton and Arthur J. O'Leary, as executor, appeal separately. Reversed.

Argued before VAN BRUNT, P. J., and PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

Roger Foster, for appellants.

John A. Foley, special guardian for respondents John C. and William Egan.

Joseph H. Fargis, for respondents Annie Egan and Hugh Egan.

O'BRIEN, J. We think that the executor has in this case the right to appeal. The Code of Civil Procedure provides (sections 1294 and 2568) that a "party aggrieved may appeal." These words, as applying to executors, have been construed in several instances by the court, but we have been referred to no case wherein the refusal of the surrogate to admit a will or codicil to probate was involved. In the authorities cited in the dissenting opinion, the question related to the construction to be given to a portion of a will which arose after probate, and in the course of administration, when the obligation resting upon the executor was purely ministerial, and he had no interest in the actual distribution made, and therefore was not "aggrieved" by the decision rendered. A distinction, however, is to be observed between directing an executor as to the precise manner in which he shall act, and in denying to him the right to act at all. In the latter case he becomes a "party aggrieved," because he is charged with the duty of probating the instrument by virtue of which he receives his office, and thus he is entitled to appeal from a decree which ousts him from the exercise of such functions, and which denies to the beneficiaries whom he represents the right to receive the property as set forth in the will or codicil. This principle was fully recognized in the authority relied upon, of Bryant v. Thompson, 128 N. Y. 435, 28 N. E. 522, 525, 13 L. R. A. 745, wherein the court defined a "party aggrieved" as one "having an actual and practical, as distinguished from a mere theoretical, interest in the controversy," and said:

"The case of People v. Jones, 110 N. Y. 509, 18 N. E. 432, is not contrary to these views. In that case the commissioners of the land office, representing the state, made a grant of land under water to an individual. Subsequently the determination of the commissioners * * * was reversed by the supreme court on certiorari, and the commissioners appealed to this court, where a motion to dismiss was denied. The order appealed from in that case in effect nullified the grant made by the state, and the commissioners, as public officers representing the state, were in duty bound to defend the grant against the effect of an erroneous decision, and so were aggrieved."

And in Bliss v. Fogg (Sup.) 27 N. Y. Supp. 1053, it was held (head-note) that:

"Where judgment is rendered for defendants in an action by executors to compel a transfer to them of certain property, the executors are parties 'aggrieved,' within Code Civ. Proc. § 1294."

In considering similar language in Green v. Blackwell, 32 N. J. Eq. 768, 772, where the statute there gave an appeal to "any person aggrieved," the court said:

"Whoever stands in a cause as the legal representative of interests which may be injuriously affected by the decree made is, within the meaning of these laws, aggrieved, and therefore may appeal."

A codicil is a part of the will. It is executed with the same formalities, and the testamentary disposition sought by it to be made is treated and is the same as though the provisions were actually incorporated in the body of the will itself. The codicil in fact is a will, and is to be carried out by the executors named in the will, and therefore the same rules apply as would apply to rights of parties acquired under a will.

Upon the merits, we think this is peculiarly a case which should be submitted to a jury for determination. The evidence, as we view it, preponderates in favor of the conclusion that the codicil was duly and properly executed, and that the testatrix was of testamentary capacity. What is to be kept in mind in every case where the probate of a testamentary paper is involved is whether the legal requirements are complied with, and whether the testator was of sound mind and disposing memory, and unaffected by undue influence or constraint. As will be seen from the opinion of the learned surrogate, he was "not satisfied" that the codicil was validly executed, or that the testatrix intelligently assented to its execution, or that she was free from the restraint or compulsion of her husband. It is not attempted to show that the codicil was not executed with the statutory formalities; but it is claimed that the evidence discloses inability of the testatrix to intelligently and freely assent to the codicil, owing to her ill health and the undue influence of her husband. The testimony of the subscribing witnesses to the codicil —the lawyer who prepared it, and the family physician of the testatrix—shows that every essential element was present in the manner of its execution. They testified that she stated she wished the codicil to be made, giving to her husband the money in the bank, and it was so made, and read to her, and she approved it; that, though she attempted to rise up in bed and sign her name, the doctor thought it inadvisable, and so she was supported in bed, and the attorney held her hand on the pen, and thus the mark was made, to which he added the words, "Elizabeth Stapleton, her mark;" that she declared it to be a codicil to her last will and testament, and asked them both to sign as witnesses, which they did in her presence and in the presence of each other. The physician further testified that the testatrix had formerly indicated her desire to change her will in this manner, and he had attempted to prepare a paper for her, but learned that it was illegal, and told her she should get an attorney, which was then done. His testimony is not discredited because this

discarded paper was not put in evidence. Such testimony, showing a desire to make the codicil in question, and a compliance with the legal requisites, which is absolutely unchallenged, goes far to showing that the testatrix acted freely and intelligently. And it is supported by the further testimony of the lawyer and the physician that she was at the time, in the words of the latter, "of sound and disposing mind and memory and understanding," and not "under any restraint or influence or duress." On this subject of duress there is not a word of testimony to show that the husband exerted any undue influence. The uncontroverted testimony, even of the contestants' own witnesses, is that there had never been family disputes; and the fact that the husband was attentive and well disposed towards his wife, and was with her constantly during her illness, is what was to be expected of him, and is no basis for finding that he exerted undue influence.

The real question thus comes to be whether or not the testatrix was physically able to intelligently supplement her will by this codicil. It is true that she was, as stated by the learned judge writing the dissenting opinion, "on her deathbed," but so she was when she executed the will itself. Was she on the 18th day of March (the date of the codicil) able to make a valid testamentary disposition? Those who were present say that she was; and these include, besides the lawyer and the physician, the housekeeper, who said "she was all right in her mind, and knew what she was doing and saying"; adding that after the execution the testatrix requested her to remove papers scattered upon the bed, and to give her a drink of water, and thereafter said she wanted to lie down, as she had been propped up in bed. The housekeeper further said that the day before Mrs. Stapleton had given directions as to what preparations to make for dinner. Another witness said she had seen the testatrix the day prior to the making of the codicil, and she had mentioned that she intended to give the money to her husband; and a boarder in the house testified that the day previous (March 17th) he had talked with her, and she was rational, and he often had seen and spoken with her about that time. Another witness said she called on the testatrix on March 23d, and shook hands with her, and asked her how she felt, and she said she was feeling pretty good, but she was very weak; that Mrs. Stapleton then asked about her family, and she thought her of sound mind. Father Farrelly, who from March 1st had constantly attended the testatrix, testified that at times she was flighty, but that about the middle of the month he came to the conclusion that she was going to get better, and that on the 18th of March he took her confession. As to this we have the following questions and answers:

"Q. You had every opportunity on that particular day of seeing her condition,—of observing her condition? A. Yes. Q. You can state positively that she spoke intelligently on that day? A. Oh, yes. Q. Heard her confess intelligently? A. Yes."

Another priest testified that at times during March his conclusion was that her mind was wandering, but she also during that month spoke to him intelligently. A niece of the testatrix testified that either on the 19th, or else on the 26th, she called on her aunt, but had not

seen her previously for a year, and her aunt did not know her. And another niece testified that she saw her aunt on March 12th, and the latter asked her irrational questions. The contestants also called one of the residuary legatees, who testified that he was in the habit of visiting his aunt during her last illness, but he was not asked how she was at such times.

It will be seen that the testimony of all the contestants' witnesses regarding the irrational condition of the testatrix at the times mentioned by them is not inconsistent with the testimony of the proponent's witnesses that on the 18th of March, when the codicil was duly executed, she was of sound mind and disposing memory. On the other hand, to refuse probate to the codicil is to impeach the statements of the subscribing witnesses,—a physician and lawyer. The testimony of the two nieces that, when they called, their aunt did not appear rational, is explained by the priests who called often during the month, and who testify that sometimes she was "flighty," although at other times perfectly intelligent. That she was of sound mind on the 18th, and able to make a valid disposition of her property, as testified by those present at the time, is corroborated by the statement of Father Farrelly that about the middle of the month he thought she was going to get better, and that on the 19th (the day following the execution) he took her confession. And it is also corroborated by all the other disinterested witnesses who called about this time and conversed with the testatrix. Furthermore, according to the housekeeper, who was with Mrs. Stapleton constantly, she did not become actually unconscious until two days before her death, which occurred March 31st,—nearly two weeks after the execution of the codicil.

From this summary of the evidence, we think it is clear that this case, as stated, is one requiring that the question of the testamentary capacity of the decedent should be determined by a jury. That part of the decree, therefore, from which this appeal is taken, should be reversed, and a trial ordered before a jury, with costs to the appellant to abide event.

VAN BRUNT, P. J., and PATTERSON, J., concur.

LAUGHLIN, J. (dissenting). The decree admitted the will to probate, but adjudged that the codicil was null and void upon the ground that at the time of its execution the testatrix "had not sufficient mental capacity to execute the same;" and "was not free from restraint or compulsion of her husband, Patrick Stapleton." The appellant Stapleton was the husband of the testatrix, and he alone was benefited by the codicil. He was duly cited on the probate proceedings, but failed to appear, and as to him the decree was entered by default. The appellant O'Leary is one of the executors of the will, and it was probated on his application. Father Boyle, the testatrix's parish priest, was the other executor, and he appeared in the proceeding, but has not appealed. The will consisted of 13 clauses or paragraphs, apart from that in which the executors are appointed. The first 11 clauses directed the payment of her debts and funeral expenses, and the sale of the house and lot where she resided, and of which she died seised, and gave

legacies aggregating $5,600, together with two specific bequests,—one, of her life insurance; and the other, of another lot and improvements within the city of New York. By the twelfth clause she gave, devised, and bequeathed the rest, residue, and remainder of her property to the children of her deceased sister, Mary Egan, share and share alike. By the thirteenth clause she declared that she made no mention of her husband in her will, "because he is already too well provided for with this world's goods to need anything from me." The will was executed on the 26th day of February, 1899. The codicil was executed on the 18th day of March, 1899. It expressly revoked the twelfth and thirteenth clauses of the will, and further provided as follows:

"I give, devise, and bequeath to my beloved husband, Patrick Stapleton, all the moneys deposited to my credit in the Harlem Savings Bank, 124th St. and Third Ave., New York City; all the moneys deposited in the Emigrant Industrial Savings Bank, 51 Chambers St., New York; and all the moneys deposited in the Bank for Savings, to my credit, 24th St. and Third avenue, New York City. And I do hereby further give, devise, and bequeath all the rest, residue, and remainder of my estate, both real and personal, to my said husband, for himself, his heirs and assigns, forever, with the exception of my piano, which I give to Maria Clair."

At the outset the respondents challenge the right of the appellants, or either of them, to appeal from this decree, and this is the first question to be considered. The appellant O'Leary takes nothing under the will or codicil, except his appointment as executor, which has been confirmed by the decree. It is therefore contended, and seems clear to us, that he is not aggrieved by that part of the decree which declines probate to the codicil, within the fair intent and meaning of the provision of the Code authorizing such an appeal by an aggrieved party. Code Civ. Proc. §§ 1294, 2568; In re Hodgman's Estate, 11 App. Div. 344, 42 N. Y. Supp. 1004, affirmed in 161 N. Y. 627, 55 N. E. 1096; In re Coe, 55 App. Div. 270, 66 N. Y. Supp. 784; Bryant v. Thompson, 128 N. Y. 426, 28 N. E. 522, 13 L. R. A. 745; In re Hodgman's Estate, 140 N. Y. 421, 35 N. E. 660. The appellant Stapleton, being the sole party benefited by the codicil, is manifestly the "party aggrieved" by that portion of the decree from which the appeal is taken. The record, however, fails to show that he appeared in the probate proceeding, and, as to him, the decree seems to have been "rendered or made upon his default." The court is therefore without jurisdiction to hear the appeal. Code Civ. Proc. §§ 1294, 2568; In re Peekamose Fishing Club, 151 N. Y. 511, 45 N. E. 1037; Innes v. Purcell, 58 N. Y. 388; Flake v. Van Wagenen, 54 N. Y. 25; McMahon v. Rauhr, 47 N. Y. 67, 72. It follows that both appeals should be dismissed, with separate bills of costs,—one to the respondents Annie Egan and Hugh Egan, and one to the special guardian of the infant respondents,—payable by the appellants personally.

If, however, we are to consider the merits of the appeals, I think we should arrive at the same conclusion, except that the decree should be affirmed, with such separate bills of costs to the respondent, instead of being dismissed.

The beneficiaries under the twelfth clause of the will answered the petition for the probate of the will and codicil, and objected to the pro-

bate of the codicil. No objection was made to the probate of the will. Its provisions and the circumstances attending its execution are material, therefore, only so far as they have a bearing on the contest over the codicil. An examination of the merits requires a review of the facts. On such an appeal this court has the same power to decide questions of fact which the surrogate had; and it may receive further testimony or documentary evidence, or appoint a referee, and may, if necessary or proper, direct a jury trial of the material questions of fact. Code Civ. Proc. §§ 2586–2588. We have not been requested, however, to receive further testimony or evidence; nor has it been suggested that the facts could be changed upon a new trial. The proper consideration of the appeal, therefore, requires an expression of the individual judgment of each member of the court upon the question as to whether the evidence shows that the testatrix was competent to make the codicil, and that it was her free voluntary act, or whether it shows that she was either incompetent or was unduly influenced by her husband. A careful examination and consideration of the evidence convinces me that the learned surrogate has properly decided the facts.

The amount or value of the estate does not appear, but the value of the house and lot where the testatrix resided, according to the witness Sullivan, who drew the codicil, was $17,500. The testatrix died on the 31st day of March, 1899, or 13 days after the execution of the codicil. On the 12th day of February preceding her death, according to the evidence of the appellant O'Leary, who was her family physician, the testatrix became ill, and was from that time on confined to her bed. She was upwards of 46 years of age; weighed from 175 to 195 pounds; of ordinary intelligence; able to write; of a talkative disposition; and for something like 13 years or more she had been engaged in the dry goods business on her own account. Her ailment was cirrhosis of the liver. At first she could take little solid food, but was confined to a liquid diet early in her illness. Her heart action was affected at times, causing a shortness of breath. She ceased to be talkative, and became dozy, gradually growing worse, and was unconscious for about two days before her death. About three weeks before her death she ceased to order supplies for her house, or to retain charge of her moneys. Her husband was, or had been, a policeman. Her living apartments were on the second floor over her store, in the building 476 Brook avenue, which was owned by her. Her household consisted of her husband; her cousin Julia Minton, who was her housekeeper; a boy named Joseph Clarence, known as William Stapleton; and John Clare, a boarder. During her illness she had a nurse, Mrs. Peets. Of these, Julia Minton and John Clare, only, were called as witnesses. Henry W. Bates, Esq., acted as legal adviser for the testatrix. She had employed him to draw her will, and informed him how she desired to leave her property, and the will was ready about a month before it was executed. The delay in its execution was owing to her absence from the city. After her return, and on February 9th, she called at her attorney's office, and obtained her bank books, which she had left with him. On this occasion, according to the testimony of Miss

Girvin, a stenographer employed by Mr. Bates, she walked to the car with the testatrix, at the latter's request, and the testatrix inquired of her concerning the will, and particularly about the provision concerning her husband; stating that her husband received a pension from the police department, but squandered it in a policy shop. At the time of the execution of the will, on the 26th of February, the husband was present, and heard Mr. Bates carefully read and explain the will to the testatrix. On hearing the provisions of the will, the husband asked, "Where do I come in?" to which the testatrix replied, "You are taken care of all right." Mr. Bates, Miss Girvin, and the husband were the subscribing witnesses to the will. The alleged codicil was executed 20 days after the execution of the will. Although the testatrix knew how to write, and had signed her name to the will, it is conceded that she did not write her name to the codicil, but it is claimed that she executed it by making her mark. At the time of the execution of the codicil it appears that she made an attempt to sit up and sign her name, but was so weak that she was unable to do either. She was then upon her deathbed. Her limbs for some time had been swollen by her disease, and she had virtually ceased to talk, except in answer to questions. It was shown that at times both prior and subsequent thereto she was irrational. The testimony of her niece, a disinterested witness, showed that on the 12th of March the testatrix inquired about the health of a number of her relatives who had been dead for years, and that the appellant Stapleton told the witness on this occasion that the testatrix had been that way all along; that the testatrix was dozing, and did not seem to understand what was said to her, and said to a cousin of the witness in her presence that the witness had been there that morning and taken her to church. Another disinterested niece of the testatrix testified that she visited her on the 19th or 26th of March, and found her dozing and wandering in her mind during the two hours the witness remained; that at first the testatrix mistook her for a cousin of the witness, but that just as the witness was leaving she called her by name, and gave her some pictures to take home, which was apparently the only rational conversation she held during that time. The testimony of Father Boyle and Father Farrelly, his assistant, is entirely consistent with her incompetency at the time of the execution of the codicil. Their testimony indicates that at times she was rational, and that at times her memory was gone and she was irrational. On the 19th of March, Father Farrelly administered to her the rites of the church, and, in his opinion, she was then of sufficient mind to understand these religious ministrations; but the fact that a woman critically ill is able to comprehend that she is facing death falls far short of establishing that she was of sufficient mind, memory, and disposition to think of her terrestrial affairs sufficiently to make a valid disposition of her property. The direct evidence as to what transpired at the time the codicil was executed is very conflicting, and the witnesses have so contradicted themselves as to seriously discredit their testimony. I recognize the rule that relatives have a right, without being charged with duress or undue influence, to

call attention to their claims upon the bounty of a person about to make a will; but in the case at bar I am impressed with the belief, from reading and weighing the testimony, that the husband unduly influenced his dying wife to make this codicil, contrary to her wish and intent, at a time when she was not of sound and disposing mind and memory. It is significant that he defaulted on the probate proceedings, and did not take the stand as a witness. It was competent for him to deny that he manifested displeasure at the will as originally made and executed. Concededly the testatrix was then competent, and far stronger mentally than at the time of the execution of the codicil, yet his complaint that he was receiving nothing under the will had no effect on her mind at that time. It was competent for him to deny his admission to the niece on the 12th of March that the testatrix had been in that flighty, irrational condition all along during her illness. It was also competent for him to show that he was not properly provided for, was not receiving a pension, and had not squandered it by playing policy, as stated by the testatrix. Yet he has not denied any of these things. The appellant O'Leary first testified that at the beginning of her illness the testatrix asked him to draw a paper giving her money in the banks to her husband, but he subsequently altered his testimony, and fixed the time after the execution of the will. He says she told him she had made a will, and left her husband out, and she wanted to right the wrong, and that he drew a paper to that effect, which she signed. The paper was not produced. He also says that he ascertained from his brother on the day of the execution of the codicil that this paper would not be effectual for the purpose intended, and advised the testatrix to that effect, whereupon she summoned her husband, who suggested that they get a lawyer, and that at the request of the testatrix the husband went out, and within 15 or 20 minutes came back with Lawyer Sullivan; that he was present during the attorney's talk with her, and did not hear her give the latter the names of the banks, but he subsequently changed his testimony, and said the lawyer talked with her privately; that the husband was in and out, and was present when the codicil was finally read to the testatrix and executed. He also says that Mrs. Minton, the housekeeper, was present and propped the testatrix up with a pillow at the time the lawyer had her make her mark, but this Mrs. Minton denies. The attorney who drew the codicil first testified that, pursuant to a message left at his house, he called on the testatrix between 11 and 12 o'clock on the evening of the 17th of March; that he had done some criminal business for her relatives at her request, but he knew that Mr. Bates was her attorney; that the testatrix told him that her husband had earned the money, and she had taken care of it for him, and she wanted to change her will; that he read the will, and handed it back to her, because he wished the doctor to be present at the time of the execution of the codicil, and made an appointment for the next day; that he came pursuant to that appointment, and not, as claimed by Dr. Sullivan, on the summons of her husband; that he drew the codicil in the kitchen; that the testatrix told him she desired her husband to have the property disposed of by the twelfth

and thirteenth clauses of the will; and that after he drew the codicil he read it to her. At first he testified that he conferred with nobody before going to the testatrix's room, but later he said that he saw the appellant Stapleton in the kitchen, and told him to keep out of the room where testatrix was; that after his interview with the testatrix, when he went to the kitchen to draw the codicil, Stapleton was there, and brought the ink. After he had been repeatedly asked to state all the conversation between him and the testatrix, and had failed to show where he got the names of the banks which he inserted in the codicil, he finally testified that he got them from the testatrix, and located them from memory. When asked to repeat the whole conversation again, he then first revealed the fact that this was his third visit to the testatrix, and that he had called to see her about a week or ten days before, pursuant to word left at his house, by whom he did not know, and says that on that occasion she told him she wanted her will changed so as to give the balance to her husband, but that she could not get the will herself, and he departed on the understanding that he would call when sent for. It appears from the testimony of this attorney that he volunteered the information to the testatrix that there would be a surplus out of the premises where she lived after paying the legacies which she had provided for in the will, and that she thereupon informed him that she wanted her husband to have that also. When asked if she was strong enough to sign her name, he says that he did not know she could write, although, according to his evidence, he had the will before him signed by her. I regard it as quite significant that the husband persisted in being in the room when the codicil was read and executed, after he had been advised by the attorney to remain out. There is no rational explanation for a change of intention on the part of the testatrix between the time of the execution of her will and codicil. There appeared to have been no change in her relations with her nieces for whom she provided in the twelfth clause of the will. Nor does it appear that there was any change in her relations with her husband, or in his financial affairs. It was not shown, or attempted to be shown, that the husband earned the money which was deposited in these banks as stated by her, according to the testimony of some of the witnesses. Nor was it shown that she authorized the summoning of Attorney Sullivan on either the first or second occasion.

The evidence in this case covers more than 100 pages of the printed record, and I have not attempted to digest it all. I have called attention in a general way to that which I deem probable, and which to my mind satisfactorily indicates, and justifies the inference, that the codicil was not the free act of a competent testatrix. I therefore see no occasion for ordering a jury trial, and, if the merits are to be considered, I favor affirmance, with separate bills of costs to the respondents, as indicated.