which was excluded for the reason mentioned, and proper exceptions were taken to the exclusion of all this evidence. We think proof of this character was fairly within the scope of the entire article and of the general charge quoted, and may have been important to enable the defendant to establish that he had accurately gauged the official conduct of Judge Stowell. If the defendant was able to show derelictions of Judge Stowell while on the bench, that proof supported the charge made, as well as infractions committed at chambers. The fact that defendant had stated one or two instances in vindication of the correctness of the accusation did not debar him, when its truth was challenged, from making proof of other delinquencies of the judge when acting in his judicial capacity.

For these errors in excluding the testimony referred to and limiting the article in the manner mentioned, the judgment should be reversed and a new trial granted.

Judgment reversed, and a new trial granted. All concur, except McLENNAN, P. J., who dissents.

---

### In re ECKLER'S ESTATE.

(Supreme Court, Appellate Division, Fourth Department. May 6, 1908.)

1. WILLS—PROBATE—DENIAL—APPEAL—QUESTIONS OF FACT—TRIAL BY JURY.
    On appeal from a surrogate's decree denying probate to an alleged will, evidence examined, and *held* to require submission to the jury, as provided by Code Civ. Proc. § 2588, of the questions of testamentary capacity, the due execution of the will, and of fraud or undue influence.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 852.]

2. WITNESSES—PRIVILEGED COMMUNICATIONS—COMMUNICATIONS TO ATTORNEY
    —STATUTORY PROVISIONS.
    In proceedings to probate a will, testimony of the attorney of testator as to what occurred in an interview between himself, the executor, and decedent regarding the will was admissible; it not being a confidential communication within Code Civ. Proc. § 835, forbidding an attorney to disclose a communication made by his client, or his advice given thereon in the course of his professional employment.

3. WILLS—PROBATE—APPEAL—RIGHT OF EXECUTOR.
    An executor may appeal from a surrogate's decree denying probate to a will.
    McLennan, P. J., and Williams, J., dissenting.

Appeal from Surrogate's Court, Herkimer County.

In the matter of proving the last will of James Eckler, deceased. From a decree of the surrogate denying probate (95 N. Y. Supp. 986, 47 Misc. Rep. 320), proponents appeal. Reversed and a trial of the issues of testamentary capacity, the due execution of the will, and of fraud or undue influence directed to be had before a jury, as provided by Code Civ. Proc. § 2588.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

James Conkling, M. G. Bronner, and A. M. Mills, for appellant.
Henderson & Bell, Steele & Prescott, and Arthur Beebe, for respondents.

KRUSE, J. James Eckler, over whose will this controversy arises, died on the 17th day of April, 1900. He left no descendants, and no brothers or sisters, save one, a sister, Eva M. Eckler, who has been incompetent since childhood. He also left several nephews and nieces, children of deceased sisters. He was 87 years of age at the time of his death.

The alleged will was made on June 12, 1895, about five years before his death. By its terms all his property was given in trust to George H. Cristman, the husband of a cousin of the deceased, for the support, care, clothing, and funeral expenses of the incompetent sister; and, upon her death, the residue was given absolutely to Cristman, naming Charles Young as the executor of the instrument. The property consisted of an undivided seven-eighths of a farm, worth about $2,000, and personal property worth about $25,000. The will was drawn by Cristman, and, were it not for this fact, I think there would not be even a suspicion that the will was not precisely as the deceased wanted it, and its validity could not be reasonably questioned. At the time the will was drawn and executed, the deceased lived with his two sisters in the village of Mohawk, Herkimer county. He had no brothers, and his other sisters had died. One of the sisters was Eva, the incompetent, and the other was Angeline Eckler, a widow, whose husband's name seems also to have been Eckler. The sister Angeline was ill with a mortal disease—cancer of the stomach—from which she died within a month after the will was made. She evidently realized that she had not long to live, and was very anxious that her sister Eva, the incompetent, should be cared for, and it had evidently been a matter of conversation between her and her brother. Cristman and his wife seem to have been on good terms with this family. They lived about 10 miles away, on a farm. On June 11, 1895, they attended the funeral of Daniel Crim, at Jordanville, about eight miles from Mohawk, and, having learned of the serious illness of Angeline, they drove over to see her after the funeral. They stayed over night, and the next day, June 12th, the will was made. Angeline had theretofore made her will, and I think the inference is permissible from the testimony that she had willed at least some of her property to her brother James, and she was very insistent that he should make a will providing for their incompetent sister. She told him that, if he did not do so, she would change or destroy her will, to which James replied that he did not want her to do so; that he was going to provide for the sister, and make provision for her support as long as she lived. Angeline told him that she wanted him to make his will that day; that she did not know how long she would be there, and he said he was willing to provide for her, and had thought of making his will for a long time; that he had intended to and was ready to do it. He and Cristman went out and returned with a blank will, which was filled out by Cristman, subscribed by Eckler, and witnessed by Mrs. Cristman and a Mrs. Shoemaker, who was also a cousin of the Ecklers. The will was taken by Cristman and put in his safe. I think the proof fairly shows, not only that the will was properly executed, but that the disposition of the testator's property was made as he desired. The will

was read aloud to him in his presence, and before it was drawn, in reply to inquiries made by the draftsman, he stated that he wanted his property left for the support of Eva as long as she lived, and, upon further inquiry as to what he desired done with the rest of it, he stated that he wanted Mr. Cristman to have it, and I think the evidence further shows that he was entirely competent to make a will.

Immediately after the death of Angeline, which occurred July 2, 1895, he went to Cristman's, and lived there until October, 1899, when he went over to his farm and lived with Charles Ostrander until his death, which occurred the following April. It is true that, after the making of this will, there is evidence of declarations made by the testator, to the effect that he had not made a will, and that he was not going to make a will, but there is also evidence showing that he knew he had made a will, and recognized that it was in force. It is not very strange that he should be reluctant to inform the inquirers of the fact that he had made a will or of its contents. Some of them had no interest in the matter other than mere curiosity. Others seem to have been interested in his making a will, hoping to get some of his property, but he had repeatedly declared that his nephews and nieces should not receive any of his property. Some of them he seems to have distrusted. Toward others he had a violent dislike, owing to the fact that he believed they were intemperate and indolent. To one of them he had loaned money, which had not been paid back. The mere fact that they were blood relatives did not obligate him to leave to them his property. The evidence does not show that, either through friendship or otherwise, he would naturally be prompted to leave his property to them, but quite the reverse. His friendships were with others. It is true that Cristman was not a blood relative, but his wife was, although more remote than his nephews and nieces; she being his first cousin. Had the contestants been his children, or either of his two sisters, there would be much more force in the suggestion that the will was unnatural and unjust. It is not difficult to understand, in the light of the evidence and surrounding circumstances, that the contesting nephews and nieces did not have the hold upon his affections, as the family with whom he afterward made his home, and with whom he had been on terms of intimate friendship for years.

I do not think the severe criticism made upon the testimony of Mrs. Shoemaker is deserved. She was a lady 66 years of age; and was subjected to a most searching cross-examination. She was examined and re-examined time and again, until, as she states, she was tired and weary, and her suggestion that counsel were asking the questions over and over again I think is borne out by the record. I do not think we are justified in brushing aside and disregarding her testimony.

Much is made of the fact that the sister Angeline at the time the will was executed delivered up to Mrs. Shoemaker a note held by Angeline and made by Mrs. Shoemaker for $600. There is no evidence to show that it was an unnatural thing for Angeline to do. Mrs. Shoemaker had taken care of her, and the evidence shows that she (Angeline) had said she would give her the note, and wanted Mr. Cristman to give it to her after her death; and all Cristman had to

do with it was to tell Angeline that, to make it lawful, it would be necessary for her to deliver the note to Mrs. Shoemaker.

It is true, as is suggested by Mr. Justice WILLIAMS, that the expense of the litigation is seemingly large. Whether it is more than it should be we do not know. All we know about the matter is what appears in the record, and that has not been made up to present the question of the allowances made. In any event, the question is not before us, and, even if it be subject to criticism, that affords no good reason for turning over the balance of the estate to the contestants, unless they are entitled to it.

I think the circumstances of this case are such as to require a jury trial, under the rule adopted by this court. Matter of Burtis' Will, 107 App. Div. 51, 94 N. Y. Supp. 961. We have recently made similar decisions in cases where I think the circumstances were no more favorable to that disposition than in this case. Matter of Gates' Will, 121 App. Div. 893, 105 N. Y. Supp. 1117; Matter of Diadama's Will (decided at March, 1908, term) 109 N. Y. Supp. 1128.

2. Furthermore, I think the objection to James Conkling stating what occurred in the interview between himself and Cristman and the deceased regarding this will was improperly sustained. It was excluded upon the ground that it was incompetent under section 835 of the Code of Civil Procedure, which forbids an attorney disclosing a communication made by his client to him, or his advice given thereon in the course of his professional employment. The testimony tends to show that, if there was the relation of attorney and client, it existed between the witness and Cristman, and not Eckler, the deceased, and the witness. But, assuming that the relation of attorney and client did exist between Eckler and the witness, it was not a confidential communication. Whatever was said and done took place in the presence of and with Cristman. The object of the statute is to prevent an attorney disclosing a communication made by the client which is confidential. Doheny v. Lacy, 168 N. Y. 213, 61 N. E. 255; People v. Bloom (Sup.) 109 N. Y. Supp. 344. As Judge Gray says in the Doheny Case, at page 224 of 168 N. Y., page 258 of 61 N. E.:

"The rule of immunity as to communications between persons sustaining the relation of attorney and client was not intended, in my opinion, to operate where two or more persons are present, or are cognizant of the attorney's professional work. They are not then confidential."

It may be said in passing that there is more reason for ordering a new trial before a jury in a case like this than where a will has been admitted to probate. In the latter case any person interested, as devisee, legatee, or otherwise in the will which has been admitted to probate, or any heir at law or next of kin of the testator, may bring an action to determine the validity or invalidity thereof, and have a jury trial thereon, while no such remedy exists when the will has been rejected. Code Civ. Proc. § 2653a.

The respondents contend that the executor has no right to appeal. That question, however, seems to have been decided adversely to them in Matter of Stapleton's Will, 71 App. Div. 1, 75 N. Y. Supp. 657, which decision was followed by this court in Matter of Rayner's Will, 93 App. Div. 114, 87 N. Y. Supp. 23.

The decree of the Surrogate's Court should be reversed, with costs to the appellant to abide the event, and a trial by jury of the issues of fact directed, as is provided by section 2588 of the Code of Civil Procedure. All concur except McLENNAN, P. J., and WILLIAMS, J., who dissent; McLENNAN, P. J., dissenting also on the ground that under the facts in this case the appellant is not a party aggrieved under the provisions of the Code of Civil Procedure.

WILLIAMS, J. (dissenting). The decree should be affirmed, with costs to all parties payable from the estate. The ground upon which the surrogate denied the will probate was, in brief, that he was not satisfied that the deceased knew or understood that the will gave Cristman all his property, subject only to the provision for the care, support, and maintenance of his sister Eva. This conclusion was a very proper one, considering all the facts and circumstances surrounding the making of the will. I think it would be most unfortunate to reverse the decree and send the matter to be tried before a jury. The litigation over the will has already cost the estate, aside from the ordinary expenses of administration, $7,405.03. The attorneys, as appears by the decree, agreed to allowances which aggregate this large amount. They were made by the surrogate. No appeal has been taken from such allowances, or the direction to the administrator to pay them, and we may assume the money has found its way into the lawyers' pockets and is lost to the estate, whatever may be the future course of the litigation. The deceased left, at his death, a farm worth $2,000 and personal property worth $25,000, as found by the surrogate. The practical effect of a continuance of the litigation by another trial before a jury would be to enable the lawyers to absorb substantially the balance of the estate. The parties have had one full, fair, impartial trial of the issue of fact involved, and the decision made by the surrogate is quite as likely to be just and right as the verdict of any jury would be. The appeal here is by the executor named in the will, and by him alone. Cristman, the only person now living who is interested in the property under the will, does not appeal. It must be assumed, therefore, he has acquiesced in the decree of the surrogate.

In Matter of Richmond, 63 App. Div. 491, 71 N. Y. Supp. 797, where an administrator appealed, this court, by Presiding Justice Adams, said:

"The only persons having any direct interest in the determination of these questions are the legatees and beneficiaries named in the will. All these persons are of full age. They were made parties to and appeared upon the accounting, and, as none of them have joined in the appeal, it must be assumed that they acquiesce in the decree of the Surrogate's Court; and it in fact settles and determines their rights and interests as between themselves."

In Isham v. N. Y. Ass'n for the Poor, 177 N. Y. 222, 69 N. E. 368, Judge Gray said:

"In my opinion the executors were not authorized to take this appeal and to continue the controversy, when those directly concerned in the determination of the question had acquiesced therein. I do not think they have any standing in court to complain further as to a result which did not affect them."

While this appellant, by reason of being named as executor, may have the strict legal right to appeal, yet the fact of the acquiescence of the sole legatee in the decision of the Surrogate's Court should have a bearing upon the decision by this court. The executor is interested only to the extent of the fee he would receive from administering the estate, if the will should be finally admitted to probate. He has been appointed temporary administrator pending the contest over the will, and his fee as such will be as much as his fee as executor, so that he really has no interest at all. Would it not be a scandal to reverse the decree and order a trial before a jury, in view of the suggestions already made?

But to go into the merits a little: The deceased was never married. He was 82 years old when the will was made in 1895, and was 87 years old when he died in 1900. He had seven sisters originally, four of whom had died before the will was made, leaving children. Two sisters were living—one Angeline, and the other Eva. Angeline had been married, but had had no children. Her husband had died and she had some property. She was afflicted with cancer of the stomach, could live but a short time, and did die July 3, 1895, within a month after the will was made. Eva was weak-minded, and had been since her birth, and had no property at all, but was dependent on her living sister and brother for care, maintenance, and support. Angeline had made her will without providing for the support of her sister; it apparently being considered the duty of the brother to care for her during her life. On the occasion the will in question was made Angeline was persistently urging her brother to make his will, so as to provide for the sister's care during the remainder of her life, and threatened to destroy her own will unless the brother at once made his will and provided for Eva. The brother had been quite indisposed to make a will, and only consented to make one on this occasion by reason of the insistence of his sister Angeline, and she was urging it solely for the purpose of providing for Eva's support. But for this consideration it is apparent from all the evidence no will would have been made, and the property left by him would have descended to and been distributed among his relatives as provided by law in cases of intestacy. I think it very reasonable to suppose that the only object he had in making a will, the only thing that was brought to his special attention and understanding, was the care of his unfortunate sister. Cristman, the sole residuary legatee under the will, turned up just at this time. His wife was a cousin of deceased. They lived some distance away, and had no particular intimate relations with him. Mrs. Cristman came with him on this occasion. They had been to the funeral of a relative in the locality, and after the funeral came to the house, where deceased and his two sisters lived, to see Angeline, who was very sick and was not expected to live longer than a few days or weeks. The Cristmans knew of Angeline's desire to have deceased make a will. There was a good deal of talk about it that day. A Mrs. Shoemaker, cousin to Mrs. Cristman, was sent for; she living near by. She came over to the deceased's house, and remained there and helped about the house during the day, and became a witness to the will. Angeline held

a note against her of $600. There was talk about her making Mrs. Shoemaker a present of this note, and Cristman interested himself in the matter, and procured Angeline to produce the note and deliver it up to Mrs. Shoemaker. Then he undertook to, and did, draw the will in question, and attended to the execution of it. There is more or less doubt as to the formal execution of the will; the evidence being very unsatisfactory upon this subject. But we are not particularly interested in this aspect of the case.

Assuming that there was a formal legal execution of the will, and that the deceased had sufficient mental capacity to make a valid will, the question we are interested in still remains, whether deceased understood and appreciated that the will gave all his property to Cristman, subject only to a provision for the care, maintenance, and support of his unfortunate sister during the remainder of her life. Mrs. Cristman was a witness to the execution of the will, but her evidence in no way aids us in determining the question suggested here. The only witness who gives evidence directly upon this particular question is Mrs. Shoemaker. She testifies to a few words of conversation between Cristman and deceased, in substance as follows: That deceased wanted his property left for Eva's care and support while she lived, and then to go to Cristman. I do not pretend to give the precise language witness used. She stated it differently at different times during her examination as a witness. Her evidence was given in September, 1900, more than five years after the will was executed in June, 1895. It is not at all likely this woman could recollect the language used, so as to be at all certain what it was, after so many years had elapsed, and it is no wonder, therefore, that she used the different language she did in her evidence. And then she testified in substance that the will was read over to deceased, and he said it was as he wanted it. She at most heard the will read over once, and I have no idea she could be certain, after five years, that what she heard come from the lips of Cristman as he read or pretended to read to deceased what he had written down in the will was in fact the same language that the will contained when it was produced before the surrogate. I cannot undertake to quote the language of the witness, or the questions asked by counsel. I have read them all over, and it strikes me as entirely unreliable for the purpose of establishing the fact, sought to be proved, that deceased understood and appreciated that he was, by the will, giving Cristman all his property, subject only to the provision for his sister Eva's care, support, and maintenance. Cristman, the only person benefited by the residuary clause, drew the will. Judging from the language employed by him, and from the evidence in the case, he was a keen, intelligent man. He was dealing with an old, infirm man. No one else shared in their talk with reference to the contents of the will. The deceased did not read the will himself, and we can appreciate how easy it would have been for Cristman to prevent deceased from knowing or appreciating the real effect of the language used. There was a confidential relation existing between the parties, and under the circumstances it is incumbent upon the interested party to show that this confidence was not abused, and that the will was the

voluntary expression of the wishes of the deceased, and that there was no improper influence or deceit practiced in procuring the will to be made.

The relation of the parties and the circumstances here create a suspicion of wrong on the part of Cristman, which he is under legal obligation to overcome and to show good faith and honest dealing. The surrogate and this court must be satisfied that the will was the voluntary act of the deceased, uninfluenced and without deceit. How can it be said, in view of all the evidence of the statements of the deceased, and all the circumstances surrounding the case, and the wobbling, uncertain evidence of Mrs. Shoemaker, her relations to Cristman growing out of the $600 note transaction, and the interest Cristman had to procure a will in his own favor, that the suspicion, the presumption of wrong and deceit, has been overcome? How can it be said any jury would come to a different conclusion than that arrived at by the surrogate? It seems to me, under all the circumstances, that the decree should be affirmed, the litigation stopped, and what property there is left be distributed in accordance with the statute to the heirs and next of kin. We ought not, on the appeal merely of the person named as executor in the will, when the two sisters are dead and Cristman has acquiesced in the decree by failing himself to appeal therefrom, to order a retrial of the case before a jury.

I suggest that the decree be affirmed, with costs to all parties payable from the estate. The executor will then get his fees as administrator, etc., and will not suffer pecuniarily, and he is the only person having any legal interest in reversing the decree, because he alone appeals.

McLENNAN, P. J., concurs.

---

MARQUARDT v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Appellate Division, Second Department. May 1, 1908.)

1. WITNESSES—PRIVILEGED COMMUNICATIONS—WAIVER.

Plaintiff in a personal injury action, who called as a witness the physician who treated him after the accident, waived his privilege; and a waiver, once made, cannot be recalled.

2. SAME.

Appeal from Trial Term, Kings County.