(21 App. Div. 259.)

In re BRUNOR.

(Supreme Court, Appellate Division, Second Department.   October 26, 1897.)

1. WILLS—CONTESTS—FRAUD AND COERCION—REVIEW.
   Upon an appeal from a surrogate's decree admitting to probate a will contested on the ground of fraud, coercion, or undue influence, the question does not depend on whether the surrogate might have found from the evidence that the will was the free and voluntary act of the testator, or that a jury might so find, but is to be solved by a consideration of the whole evidence as a de novo question; and, if the mind of the court is in doubt, it is its duty to set aside the probate, and direct a trial of the issues.

2. SAME—CONDITION OF MIND—EVIDENCE.
   Written declarations of testatrix, found in her letters, may be competent as bearing on the condition of her mind.

Appeal from surrogate's court, Kings county.

An instrument purporting to be the last will and testament of Lena Brunor, deceased, was offered for probate by Martin Brunor, and August Loewenberger and Caroline Baer filed a contest.   From a decree admitting the instrument to probate, and directing letters testamentary to issue to proponent, as the executor named therein, contestants appeal.   Reversed, with directions.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Otto Horwitz, for appellants.

George H. Youman, for respondent.

HATCH, J.   The will which is the subject of this appeal devised to Martin Brunor, the husband of the deceased, in the event that he survived the testatrix, the whole of her estate, and, in the event he did not survive the testatrix, then to his son, Emile Brunor.   The will also states that it had been the intention of the testatrix to leave a substantial bequest to one Bertha Hirsch, a second cousin, but that her feelings had changed towards her, and therefore she left her nothing.   The husband was made the sole executor of the will.

In many respects the case presents unusual and remarkable features, to which we may briefly refer.   Prior to her marriage with Brunor, the deceased was the wife of Herman Falk, with whom she had lived happily for 24 years.   By strict economy and somewhat penurious habits, the couple had accumulated an estate of about the value of $40,000, consisting of real property, and about $3,000 in cash in the bank.   Falk died about a year prior to the marriage of the testatrix with Brunor, leaving a will, in which he devised all of his property to his wife.   The property was improved and rent-producing.   After her husband's death, she continued to conduct her business, collected the rents, and looked after the property.   It is evident that she was a woman of moderate intelligence, with some business shrewdness, and quite capable of caring for her property and herself under ordinary circumstances.   She occupied a part of one of her houses as a home, and with her lived Bertha Hirsch, the young woman mentioned in the will.   Bertha Hirsch had been an inmate of the home for six years and a half, and there is evidence tending to establish that in some

sense she was regarded as an adopted child by Mrs. Brunor.   The evidence would also have justified a finding that Mrs. Brunor and Bertha Hirsch had no differences, but lived happily together, and that it was the intention of Mrs. Brunor to make some provision for her in her will. The evidence would also have justified a finding that, up to the time of her marriage with Brunor, Mrs. Brunor was well disposed towards her brother, was upon terms of affectionate intercourse with him, and that friendly relations existed between herself and more remote relations, accompanied by some considerable intimacy.   Mrs. Brunor was 53 years of age.   She spoke and wrote the German language, was unable to speak English except brokenly, and could not write it at all.   She was a woman of little culture or refinement, with a masculine tendency. Brunor was 42 years of age, a native of Roumania.   He was married to a lady in Athens, Greece, in 1875, and by her he had one son, Emile. They separated in 1878, at Lawrea, Greece; she returning to Candia, her native place, and he going to Roumania.   Brunor does not disclose in his testimony whether he and his wife regarded this separation as permanent or not.   He contents himself by stating that she could not stand the smoke from the zinc mine at Lawrea, and so she went back to Candia, and he took the boy, and went to Roumania. He has never seen her since.   The fact of her death rests upon his statement that he received a letter from one Demetrius Ekonomas, about 1892, that she was dead.   This person, he says, was "something like a cousin" to the wife.   Brunor made no reply to this letter, but wrote to his wife once, and other persons, at Athens and elsewhere, to learn if his wife was in fact dead, but received no reply.   The son seems to have been equally unsuccessful in his attempts.   After leaving his wife, Brunor became an extensive traveler, visiting Austria, France, Turkey, Egypt, Greece, Hungary, and Roumania, and the principal cities of those countries.   He learned and speaks, for the most part, fluently, the language of each country; and at Paris, in addition to learning the language, he acquired knowledge of electroplating, a business which he subsequently followed down to his marriage with the deceased.   In Athens he analyzed metals, and has from time to time experimented with poisons.   He was also the author of a book, but upon what subject does not appear.   He came to this country in 1888, and continued to follow, with more or less success, the business of electroplating, and was assisted about the business by his son, who for some of the time was his partner, and who rented in his own name a place in Maiden Lane, New York, where for a time the business was carried on.   Although Brunor had been advised of his wife's death, he procured a decree of divorce from her in the court of chancery in New Jersey, which was entered on the 21st day of April, 1894.   About the date of the entry of this decree (prior thereto according to Brunor's statement), he told Tilsitter, a marriage broker, that "he wanted to get a wife."   Tilsitter informed him of Mrs. Falk; gave him her address.   He called upon her, and introduced himself.   It would seem that Mrs. Brunor had some misgivings about the first wife after Brunor's first call, for on the next day she visited the son at the electroplating establishment, and interrogated him upon the subject. He informed her that his mother had died in Greece about two years

before, and that he had a letter from one of her relatives to that effect. Mrs. Brunor asked, in the event she was not dead, if she could come here and make trouble for his father and her. The son assured her that there could be no trouble, as his father was divorced; and he stated, as an additional assurance, "But, anyway, if she came to this country, I should support her." This seemed to have resolved Mrs. Brunor's doubts upon that subject. We may gather from Brunor's testimony this description of the deceased: She appeared to be 48 years old; pleasant woman, of medium size; weight, 180 pounds, and stout. She was of dark complexion, had a wart on the left cheek a quarter of an inch in size, and some growth of hair on her face, which she cared for. She was not a handsome woman. She was hard of hearing, a defect which Brunor says he cured. "She spoke a common labor language, like a woman of low station would speak in that neighborhood. This woman that I met there in this manner, I have just described, bore all the indications of a woman who had worked hard every day. She was not what I would term a refined woman. She was not a ladylike person. * * * She had a good education in some lines. In business and real-estate matters she had a good German grammar education. This is the woman I learned not alone to know her on the day I called there; she invited me to go out with her, and we wanted to speak together alone. We went out, and she came to my office. That was the next day. I discovered all these qualifications of this woman on my visiting her, and on her visit to my office the next day. I had a chance thus to become acquainted with her, and see what kind of a woman she was. I became acquainted with her, and found out all these things that I have described, in two days. Either one or two days after I visited her I married this woman." The marriage was solemnized in August, 1894, and the couple took up their residence at Mrs. Brunor's home, 402 Van Brunt street, in Brooklyn. A few days after the marriage Brunor directed Bertha Hirsch to leave the house, which she did, and did not thereafter return. The son, in about two weeks, came to reside at the house; and the family, from that time to the death of Mrs. Brunor, consisted of the three persons. On December 31, 1894, Mrs. Brunor conveyed all of her real property to John J. Kearney, for a consideration of $10; and Kearney immediately conveyed a life interest in the same property to Mrs. Brunor, with remainder over to the son, Emile Brunor, subject to the life estate. On the 23d day of March, 1895, she made and executed the will which is the subject of this appeal. In March or April of the same year, Brunor abandoned his electroplating business, moved his poisons to the house, and both he and the son remained at the house, 404 Van Brunt street, continuously. On the 24th day of June following, Mrs. Brunor took some of the poison then in the house, with suicidal intent, and died upon the next day.

The evidence given upon the part of the proponent tended to establish that the will, as made and executed, was the voluntary act of the testatrix, and that she was uninfluenced by any other considerations than a desire to leave all of the property then at her disposal to her husband. A jury, upon a trial of such issue, would be justified in so finding, upon the testimony now before us. The question, however, in

cases of this kind, does not depend upon the consideration as to whether the surrogate might have found from the evidence that the will was the free and voluntary act of the testatrix, or that a jury might so find, but, rather, is it to be solved by a consideration of the whole evidence as a de novo question; and if, upon such consideration, the mind of the court is in doubt upon the question of whether the will is the free and voluntary act of the testatrix, it becomes a question of fact for the determination of a jury, and it is the duty of the court to set aside the probate, and direct a trial of the issues. In re Van Houten's Will, 11 App. Div. 208, 42 N. Y. Supp. 919; Howland v. Taylor, 53 N. Y. 527.

Beyond the statement already made, we do not deem it necessary to discuss in detail the evidence given by the respective parties in support of their positions. We have already said that the evidence would warrant a finding by a jury upholding this will as a valid instrument. We are also of opinion that the evidence would justify a finding that this will was the product of undue influence and coercion, exercised by Brunor upon the mind and person of the testatrix. In view of the fact that in this respect we are at variance with the view entertained by the learned surrogate, who admitted the will to probate, it is proper that we state the foundations of our conclusion. It is quite evident from the statement already made that a jury would be justified in concluding that Brunor's first wife was alive, or, at least, that he had no evidence that she was dead, and that the representations which he made in that regard were a fraud upon the deceased. The same may be said with respect to hi- divorce. That was void, as the court was without jurisdiction to grant such judgment (In re Kimball's Estate, 18 App. Div. 320, 46 N. Y. Supp. 177; People v. Baker, 76 N. Y. 78; O'Dea v. O'Dea, 101 N. Y. 23, 4 N. E. 110; Doughty v. Doughty, 28 N. J. Eq. 581); and he must be presumed to have known it. The disparity in age, cultivation, and personal appearance between the testatrix and Brunor, coupled with the circumstances surrounding their acquaintance and immediate marriage, tend to lead the mind to the conclusion that Brunor's sole motive in contracting this relation was mercenary, and that his purpose was to obtain control of the property which she owned. The evidence offered by the contestants tends to establish that, immediately upon the consummation of the marriage, he dismissed the woman's only companion, and, this accomplished, entered upon a course of treatment brutal in character, continuous in application, and effective in results, to such a degree that he obtained and exercised a controlling influence over her. This is evidenced by her letters, and by the oral testimony of several witnesses. While this woman was a strong, vigorous woman, of native shrewdness and considerable force of character, we may easily infer that Brunor, with his superior mental equipment and education, which the woman believed in, could with little difficulty so work upon her fears as to make her regard her position with serious apprehension, and at the same time make her distrustful of her relatives and others. That Brunor made use of the charge that she had destroyed a will of her former husband, which changed the disposition of the property from herself to her brother-in-law, and was therefore liable to criminal prosecution, is made evident by the testimony of the witnesses and the

written declarations of the testator. That such a charge would arouse fear and apprehension in the mind of an ignorant person is evident upon mere statement. That it was a weapon of controlling power in the hand of an educated person, operating upon the mind of ignorance, is quite clear. That it was so used by Brunor, to influence and control his wife, is established if the witnesses are to be believed. It may also be found that he so far controlled the movements of the testatrix that intercourse with her relatives and friends was denied to her, and that such communication as she held with them was carried on surreptitiously, and against Brunor's express direction. We are quite convinced that, within the rule laid down in Marx v. McGlynn, 88 N. Y. 357, a jury would be authorized to find that this will was the result of undue influence and coercion. We are also of opinion that the evidence was sufficient to warrant a jury in finding a continuous course of conduct upon the part of Brunor having for its object the acquirement of a controlling influence over the mind and person of the testatrix, and that the acts from which may be found the result were so connected together, both before and after the making of the will, and bear such a relation to each other, and the condition of mind of the testatrix at the time when the will was made, that one may be said to characterize the other, and throw light upon the main subject of investigation. In this view, the written declarations of Mrs. Brunor, found in her letters, were competent, and should have been received in evidence, as bearing upon the condition of the testatrix's mind. Marx v. McGlynn, supra; In re Clark, 40 Hun, 233.

We have not overlooked the evidence given by the proponent in rebuttal of the contestants' case, which tends to contradict the evidence given by the contestants, and to show that the parties lived together happily after their marriage, and from which a jury may find complete answer to contestants' case. But, within the rule above referred to, the evidence raises a doubt as to whether this will was the free and voluntary act of the testatrix, sufficiently strong and well founded to call for a reversal of the decree of the surrogate.

A trial before a jury at a trial term of the supreme court, held in the county of Kings, is therefore ordered of the following questions: First. Was the instrument purporting to be the last will and testament of Lena Brunor, deceased, dated the 23d day of March, 1895, freely and voluntarily made by her? Second. Was the execution by the testatrix of the instrument purporting to be her last will and testament, under date of March 23, 1895, procured to be executed by fraud, coercion, or undue influence practiced upon her? Costs of the appeal to abide the final award of costs. All concur, except BARTLETT, J., not voting.