## In re BURTIS.

(Supreme Court, Appellate Division, Fourth Department. July 6, 1905.)

1. WILLS — PROBATE—DENIAL — APPEAL — QUESTIONS OF FACT — REVERSAL—
TRIAL BY JURY.

Where, on appeal, it appears that the disposition by the surrogate of questions of fact raised in an application for probate of a will are not free from doubt, and the surrogate's decision is not entirely satisfactory, the decree will be reversed, and the questions of fact sent to a jury for determination, as provided by Code Civ. Proc. § 2588.

2. SAME—FORGERY—EVIDENCE.

Where, on an application for probate of a will by which testator left all his property to proponent, a young lady, in whom testator had manifested a lively interest, though not of kin to him, it was claimed that the will was a forgery, but the testimony on such issue was involved in doubt, evidence of testator's intention with respect to proponent as to the disposition of his property was material.

3. SAME—EVIDENCE.

On an application for probate of a will, evidence that testator's signature thereto was a forgery *held* involved in such doubt as to require a finding that the will was a forgery to be reversed, and the questions of fact submitted to the jury.

Hiscock and Spring, JJ., dissenting.

Appeal from Surrogate's Court, Cayuga County.

Application by Elizabeth Cook Burgess for probate of the will of Albert G. Burtis, deceased. From a surrogate's decree (89 N. Y. Supp. 441) denying probate, proponent appeals. Reversed.

The contestants, who were the father and brother of the decedent, interposed an answer by which they alleged, in substance, that the will propounded for probate was not the last will and testament of the decedent; that it was caused to be made by undue influence; that it was not signed by the testator, or published and attested as required by law, and by an amended answer it is alleged that the alleged testator was mentally incompetent to make a valid will. Practically the only issue litigated before the surrogate was whether or not the signature to the alleged will was a forgery. After hearing all the evidence, the Surrogate's Court determined that it was, and a decree denying probate of the alleged will was duly made and entered, from which this appeal is taken.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

John D. Teller, for appellant.
Frederick E. Storke, for respondent.

McLENNAN, P. J. The question presented by this appeal is whether or not the determination of the Surrogate's Court that the signature to the alleged last will and testament of Albert G. Burtis, deceased, is a forgery, and therefore that such instrument is null and void, should be regarded as final, or should such issue be submitted to a jury pursuant to the provisions of section 2588 of the Code of Civil Procedure.

It is the settled rule in this state that in such cases, if upon appeal it appears that the disposition of the questions of fact raised by the evidence is not free from doubt, and the surrogate's decision

94 N.Y.S.—61

is not entirely satisfactory, the questions of fact will be sent to a jury for determination. Such was expressly stated to be the rule in Matter of Dixon, 42 App. Div. 481, 59 N. Y. Supp. 421, recently decided by this court. Matter of Drake, 45 App. Div. 206, 60 N. Y. Supp. 1020.

In Matter of Brunor, 21 App. Div. 259, 47 N. Y. Supp. 681, the court said:

"The evidence given upon the part of the proponent tended to establish that the will, as made and executed, was the voluntary act of the testatrix, and that she was uninfluenced by any other considerations than a desire to leave all of the property then at her disposal to her husband. A jury, upon a trial of such issue, would be justified in so finding upon the testimony now before us. The question, however, in cases of this kind, does not depend upon the consideration as to whether the surrogate might have found from the evidence that the will was the free and voluntary act of the testatrix, or that a jury might so find, but rather it is to be solved by a consideration of the whole evidence as a de novo question; and if, upon such consideration, the mind of the court is in doubt upon the question of whether the will is the free and voluntary act of the testatrix, it becomes a question of fact for the determination of a jury, and it is the duty of the court to set aside the probate, and direct a trial of the issues."

In Matter of Lansing (Sup.) 2 N. Y. Supp. 117, the court (per Learned, J.) said:

"It is our duty to examine the case de novo, and, unless we are satisfied that the probate should be granted, and have no doubt on that point, we should reverse the decree, and order issues to be tried. Howland v. Taylor, 53 N. Y. 627."

In Matter of Ellick (Sup.) 19 N. Y. Wkly. Dig. 231, a case decided by the General Term, Third Department, the court said:

"Where upon appeal from a decree of a surrogate refusing to admit a will to probate on the ground of undue influence the court is in doubt, upon the testimony, as to the correctness of the surrogate's decision, the proponent is entitled to have the case reconsidered before a jury, and the court may order it to be tried by a jury at the circuit."

Matter of Tompkins' Will, 69 App. Div. 474, 74 N. Y. Supp. 1002.

There are many decisions to the same effect. In fact, no case has been called to our attention where the correctness of the rule above stated has been questioned. It therefore becomes the duty of this court to determine, not simply whether the determination of the Surrogate's Court is supported by evidence, but whether or not the correctness of such decision is reasonably free from doubt and is entirely satisfactory. If not, then the questions of fact should be sent to a jury for its determination.

We shall not attempt to call attention in detail to the voluminous evidence contained in the record, covering nearly 1,000 pages, bearing upon the question of the genuineness of the signature to the alleged will, which is the only issue involved; but will content ourselves with a reference to its general features, which we think very clearly show that such issue is not free from debt, but is involved in great uncertainty. In reviewing the determination of the learned surrogate in that regard it is important to consider the situation of the deceased and of the parties proponent and contestant, the relations which they respectively sustained to him, and all the

surroundings circumstances, as well as the direct and expert testimony bearing directly upon the genuineness of the disputed signature. At the time the alleged will purports to have been executed, May 26, 1902, the deceased was about 59 years of age. He died on the 8th day of May, 1903. He had accumulated and was managing property of the value of about $250,000, consisting mostly of securities, and, so far as appears, he managed the same in a reasonably careful and prudent manner, invested and reinvested it as occasion required, squandered none of it, and was regarded by his business associates as entirely competent to manage his comparatively large fortune. The decedent was a bachelor; had no children; his nearest relatives being a father and brother. The evidence quite conclusively shows that he did not intend either of them should be the recipient of his bounty. He had a cousin, a Mrs. Scott, for whom he evidently had feelings of affection, and had frequently expressed the intention of making her his sole legatee. In fact, in the year 1899 the deceased executed a will in due form, bequeathing to her his entire estate. There is evidence tending to show, however, that such will was made upon the understanding that she would execute a reciprocal will, which she failed to do. At all events, after her marriage it appears that his intentions in respect to her had changed, and if it was the testator's wish that his estate should go to Mrs. Scott the evidence fails to indicate it with any degree of certainty. There is no evidence which even tends to show that the alleged testator intended or wished his property to go to his blood relatives or next of kin. The decedent first became acquainted with the proponent when she was 15 or 16 years of age, in 1896 or 1897, about 7 years prior to his death. She was then living with her mother in the city of Auburn. So far as appears, she was an ordinarily bright and attractive girl. At the time when such acquaintance began the deceased had a home or establishment on Owasco Lake, where he spent the greater part of his time, and where he entertained lavishly, not always elegantly or in such manner as becomes a gentleman, yet in such fashion as to lead men of business and social standing in the community to partake of his hospitality. It is beyond doubt that the deceased was dissipated, was addicted to the excessive use of liquor, absinthe, and cordials, and to such extent as at times, when on a protracted spree, to practically incapacitate him from intelligently transacting business. Such condition most frequently occurred at his home on the lakeside, and then it was his habit to seclude himself from his associates, and to absolutely refuse to transact any business. There is no evidence which establishes with any degree of certainty that the deceased, whether under the influence of liquor or otherwise, ever made an improvident or foolish bargain, or any agreement which was not the result of intelligent deliberation and good business judgment. When intoxicated, the evidence does indicate that he was profuse in making verbal promises of gifts to those about him, but in no case, under such circumstances, did he divest himself of any part of his property. The deceased was a man of affairs, managed a large property successfully,

appreciated its extent, and apparently understood fully the situation of all his relatives and next of kin, and any claims which they or any of them had upon his bounty. The alleged testator was competent to make a will—indeed, the learned surrogate has made no finding to the contrary—and therefore he was free to devise his property as love, friendship, duty, or passion might dictate. Nor is there any support in the evidence for the proposition, and there is no finding to the effect, that whatever the deceased did in the premises was not his free and voluntary act.

Soon after the deceased became acquainted with the proponent, she commenced to make secret visits to his house, where there were only male servants and attendants. At first she remained only a short time, but afterwards for days and weeks at a time, all with the knowledge and apparent acquiescence of her mother. The deceased was also a frequent caller or visitor at the home of proponent's mother. It is undisputed that after the decedent became acquainted with the proponent he manifested a very lively interest in her, whether for an improper purpose, and because infatuated, or as the result of true friendship and regard, is in doubt. Her apparent relations with him are certainly open to criticism. However, many of his acts respecting her do not indicate an illicit relation. He sent her to school at Ithaca, N. Y., also to Chicago, and sent her on a trip to Europe, he paying all her expenses, and during all the time she was practically absent from him. If the only relation sustained by the deceased to the proponent was that of mistress, it, to say the least, is quite unusual that he should have arranged and paid for a course of action on her part which would deprive him of her society. As further indicating the feeling of regard which the decedent entertained for the proponent, it is shown that he went abroad in 1900, but that before going he transferred to proponent a considerable amount of his property, consisting of stocks and securities, which were indorsed in blank, and placed in a sealed envelope with proponent's name and address written thereon in his handwriting, and he placed same in a vault in Fay's Bank in Auburn, where they were found intact after his death. These and many other facts disclosed by the evidence very conclusively show that the alleged testator was very greatly interested in the proponent, and that, whatever may have been its basis, whether passion and lust, or love, friendship, and regard, it largely exceeded that entertained by him for any of his relatives or next of kin.

If the evidence in the case clearly established that the signature to the will in question was a forgery, the intention of the deceased in respect to the proponent as to the disposition of his property would be wholly immaterial. But if, upon the direct and expert testimony, that issue is involved in doubt, then the intention of the alleged testator in that regard becomes of very great importance. Concededly, if it were undisputed that the testator intended the proponent should have his entire estate, his alleged signature to an instrument giving effect to such intention, although its genuineness were in dispute, would be subject to much less severe scrutiny

than if by means of such signature his property were to be disposed of in a manner contrary to his intelligently expressed intention. The circumstances presented by the evidence in this case bearing upon the intention of the alleged testator are somewhat unusual. As contended by the proponent, the deceased, having no family or immediate relatives for whom he cared, became acquainted with and interested in her, then 15 or 16 years of age. For six or seven years after such acquaintance began he sought to improve her mind by sending her to school and affording her opportunity to travel in Europe, to the end that she might become his companion, helpmate, and eventually his wife. On behalf of the contestants it is urged that the decedent's relations with the proponent were of an illicit nature, and that they were entered into by the procurement or with the consent of the mother, for the purpose of obtaining as a price of such relation the property of the deceased. These are the two conflicting theories presented by the evidence in this case bearing upon the real intention of the deceased in respect to the disposition of his property, and it is confidently asserted that such issue, so far as it is important to be considered, is not free from doubt. While apparently conceding that the decedent expressed an intention to make the proponent his sole legatee, and especially as indicated by the preparation of the two wills to which attention will be hereafter called, it is urged by the contestants that such intention was only indicated for the purpose of deceiving the proponent and her mother. The suggestion is that the deceased debauched the proponent when a mere child, and with the consent and connivance of her mother, and that as an inducement to the continuance of such criminal relation he had promised and was leading them to believe that he would give to the proponent his property, make her by will his sole legatee, but that he had no intention so to do, and that all his words and acts indicating such intention were spoken or done only for the purpose and with the intention of deceiving, and to the end that the proponent might continue to sustain the relation of mistress to him and gratify his lusts. The proposition is so abhorrent, alike disgraceful to all the parties concerned, we hesitate to adopt it as the true explanation of the many declarations and acts of the decedent, which, unless thus explained, indisputably indicate that he intended the proponent should be his sole legatee.

The chief acts done by the decedent indicative of his intention to make the proponent his sole legatee relate to the will offered for probate, and to another of practically the same import, and which bears date October 23, 1901, about seven months prior to the date of the will in suit. Concededly, the deceased wrote and signed the alleged will of 1901. Every word and figure in it is written by him, except the signatures of the two witnesses. It was written upon a plain sheet of paper, is very brief, and purports to devise all his property to proponent, and she is named as sole executor. It is written in a bold, steady hand, the arrangement and construction are not faulty, and there is no doubt of its import, or of the meaning intended to be expressed. This instrument, however,

was not executed as required by statute, although. signed by two witnesses. There is evidence to the effect that the witnesses to such alleged will did not sign the same in the presence of the decedent, that one of them at least was not present at the date when it purports to have been executed. At all events, it is conceded that such will was not executed as required by statute, and so as to make it valid for any purpose. The evidence, however, relating to the genuineness of the signatures of the witnesses thereto as such, is voluminous, and, as we think, is involved in great doubt. If Mrs. Bell, the mother of the proponent, improperly signed that will as a witness, and without the knowledge of the deceased, it would have a very important bearing upon her testimony when she asserts. that she signed as such witness the will in question. The purpose, in this connection, of alluding to the will of 1901, is to indicate that at that time it was apparently, and so far as appears upon the face of the instrument, the intention of the decedent that the proponent should be his sole legatee. As we have seen, the deceased was a man of affairs and of large property, and it would seem incredible that he should draw a will in his own handwriting, and sign it, disposing absolutely of his entire estate, if he had no intention that it should have such effect, and depend entirely upon the chance or suggestion that it would be declared void because not executed in conformity with the provisions of the statute in that regard. As we have suggested, the evidence in respect to the genuineness of the signatures of the witnesses to that alleged will is voluminous, and is involved in great doubt. To our mind, the important feature of the transaction is not whether or not the decedent made a valid will, which it is now conceded he did not, but whether or not the preparation by him of such instrument which he duly signed is indicative of an intention on his part that the proponent should have his property upon his death. As we have seen, such will, whatever may have been the intention of the deceased, was discovered to be invalid because not executed in compliance with the requirements of the statute. The question recurs, what was the purpose on the part of the decedent in drawing and signing an instrument upon its face purporting to give to the proponent his entire estate? Was it to induce the proponent to continue illicit relations with him? Or did it indicate his real intentions toward her in respect to his property? We are inclined to adopt that view of the evidence which does not brand the parties concerned as infamous.

Seven months later the alleged will in suit was drawn. Then a regular blank was used. Every written word and figure was in the handwriting of the deceased, as were also the words and figures in the attestation clause. By the terms of such alleged will all the property of which the deceased should die seised went to the proponent. She was named as sole executrix, and the will provided that she should not be required to give a bond as such executrix. Concededly the signatures of the witnesses to such will are genuine, and they both swear positively that it was executed by the deceased in their presence, all as required by law. It is contended,

however, that the deceased did not in fact sign or execute such will, but that his signature thereto was forged. Again, it is said that the deceased prepared this formal document only for the purpose of deceiving the proponent and her mother; that he did not intend what the words which he had plainly written indicated, the suggestion still being that a farce was being enacted by the decedent, the purpose of which was to deceive the proponent and her mother. It should be said in this connection that the alleged will is written in a clear, bold, and steady hand, there is no evidence of tremulousness, the language employed is in all respects suitable to express the idea apparently intended, the arrangement is beyond criticism. In fact, there is nothing about the paper to suggest that the deceased was intoxicated, or that he was not in the possession of all his faculties. It cannot be seriously contended upon the evidence that the testator at the time in question did not have sufficient testamentary capacity to enable him to make a valid will; and that whatever act he did in that regard was not free and voluntary.

Thus far we have indicated that the evidence shows quite as conclusively as otherwise that the decedent intended the proponent should at his death receive his entire property. Such conclusion practically absolves the decedent, the proponent, and her mother from any criminal or disgraceful purpose on their part. Any other conclusion must be based upon a theory or proposition alike infamous to them all. There ought to be no misunderstanding about the proposition involved in this regard. The decedent, who was competent to make a will, either made such will in favor of the proponent because of the love, affection, or regard which he entertained for her, or he pretended to make such will in her favor to the end that he might continue illicit relations with her, commenced and continued under such circumstances that by the statutes of the state he was guilty of the crime of rape. As above suggested, we hesitate to conclude that the evidence in this case clearly indicates that the decedent was a criminal, guilty of the crime of rape, that the proponent was a whore, and that her mother was a procuress. We prefer to believe that the evidence fairly indicates that all the declarations and acts of the decedent toward the proponent were born of true regard, and indicated his real intention toward her, to wit, that she should receive at his death his entire estate.

As above suggested, if the decedent did not sign the will in question, no matter what his intention respecting the proponent, she took no interest in his property, and the decree of the learned surrogate should be affirmed. As bearing upon that sole issue, viz., as to whether or not the signature to the will offered for probate is genuine, the direct evidence is positive to the effect that it was signed by the deceased as required by the statute. The two alleged witnesses so testified positively. But it may be said that their evidence was more or less discredited by the cross-examination, or by other evidence and circumstances. It cannot be said, however, that the evidence in that regard wholly preponderates against the proponent's contention. A large number of expert witnesses, so called, were called, who testified that the alleged signature was a

forgery, and about an equal number were called by the proponent, who testified with equal positiveness that such signature was genuine. Without passing upon the merits of the testimony of those learned gentlemen, we are of the opinion that their evidence left the question in dispute quite as involved in doubt as before their evidence was given. The contestants assert that the signature to the alleged will is a tracing of the name written by the deceased at the beginning and in the body of the will. Concededly, if one's signature conforms in every particular to another, one of them must be a forgery, because for all practical purposes no person can write his name twice exactly alike. Such similarity is not claimed to exist in the case of the two signatures in question, but rather it is insisted that the tracing is poorly done, and that such discrepancies as concededly exist are the result of poor workmanship. Concededly, if the alleged tracing were exact in all its details, a forgery would have been proven; but the alleged tracing is so imperfect that the conclusion is in doubt. In this case, as in all other similar cases, the experts upon handwriting are at variance. A very large number of reputable bankers, business associates of the deceased, and others express the opinion that the signature to the will offered for probate is a forgery; while, on the other hand, practically an equal number of men accustomed to making comparisons of signatures and determining as to their genuineness express it as their opinion that the signature to the will in question is that of Albert G. Burtis, the alleged testator. Some of these attempt to explain or support the opinion expressed by them by diagrams, measurements, and other tests. Others declare that they can best judge of the genuineness of such signature by comparing it with signatures concededly genuine in an offhand way, and without reference to the particular lines, or what may be called the technical features of the signature. Almost without exception these men declare that, in their opinion, the signature to the will in question is that of Albert G. Burtis, the alleged testator. The conflict in the expert testimony, so called, is so great that it would be futile for this court to attempt to learn from it whether or not the signature in question was genuine or a forgery. If it depended upon that evidence, we cannot say that the issue is free from doubt, or that we are entirely satisfied with the decision of the learned surrogate. As between the two classes of experts, the mind of the court might incline to one or the other; but in view of the conflict of testimony in that regard, and in view of the conflict as to the other circumstances respecting the proponent, and the other facts to which attention has been called, we think this court ought not to say that the issue as to whether or not the signature to the will in question is genuine or a forgery is free from doubt and that it is entirely satisfactory. We do not deem it appropriate or proper to indicate what, in our opinion, the final decision in this case should be as to the genuineness of the signature to the will in question, or to the other questions of fact raised by the pleadings, and which may become important in any future trial. It is only held upon this appeal that, in our opinion, the questions involved are in serious

doubt, and that we are not entirely satisfied with the decision of the learned surrogate. We do not intend to hold or intimate that the decision of a Surrogate's Court admitting or rejecting a will for probate may not be affirmed notwithstanding it may be incapable of accurate demonstration that such decision is correct, but we adhere to the rule as enunciated in the cases to which attention has been called that when the appellate court is in doubt, and is not entirely satisfied with the decision of the surrogate, the questions of fact should be sent to a jury under the provisions of section 2588 of the Code of Civil Procedure.

It would seem that, in view of all the circumstances disclosed by the evidence in this case, especially in view of the fact that the body of the will in question was written by the decedent, that six months before practically the same disposition was made of his property in a will concededly written and signed by him although informally executed, and in view of all the other circumstances to which attention has been called, this court should not say that the issue as to the genuineness of the signature to the will offered for probate is free from doubt, and that it is entirely satisfied with the determination of the learned surrogate in that regard. We are led to conclude that the decree appealed from should be reversed on questions of fact and that the following questions should be sent to a jury for its determination in this case: (1) Was the alleged testator competent to make a last will and testament at the time the will proposed for probate was alleged to have been executed? (2) Was such will, if executed, the free and voluntary act of the decedent? (3) Was the will offered for probate signed and duly executed by the decedent?

Decree of Surrogate's Court reversed on questions of fact, with costs to the appellant to abide event, payable out of the estate, and the questions of fact stated above are hereby ordered to be tried by a jury at a Trial Term of the Supreme Court to be held in and for the county of Cayuga, commencing on the 9th day of October, 1905.

WILLIAMS and STOVER, JJ., concur. SPRING, J., dissents.

HISCOCK, J. (dissenting). The surrogate, in reaching his decision adverse to the alleged will, has reviewed the great mass of testimony and discussed the many issues directly and incidentally involved in an opinion which is so painstaking, comprehensive, and excellent that in an ordinary case it might well be adopted as the expression of our views in voting to affirm his decree. But the character of the case, the amount involved, and especially the fact that a large amount of evidence has been presented for the first time upon the appeal to this court, seem to render it proper that I should, as briefly as possible, state the reasons which influence part of this court. Even though the opinion may go to a greater length than is desirable, it still will be impossible to discuss in detail all of the facts and issues which the counsel have zealously and skillfully urged upon our attention, or to enumerate all of the reasons which lead us to our conclusions.

The fundamental question considered upon this appeal is whether this court is justified, upon a mere printed record, in setting aside the judgment of a careful surrogate upon an issue of fact after he has spent weeks in hearing the evidence and watching the appearance of witnesses, and in sending back the case to be tried over at great expense before a jury, who cannot possibly give to ascertaining the truth the care and attention which he did. I do not believe the facts and the law warrant this course, and I shall take up their consideration in the order stated.

Albert G. Burtis died May 8, 1903, aged 59 years, possessed of an estate of about $250,000, and leaving as his immediate relatives his father and brother, the original contestants. Some years before this his wife had obtained a decree of absolute divorce from him in this state, and there appeared after his death an alleged common-law wife, who, however, seems to have been eliminated. He established near Auburn a country home known as "Springside," where during the last years of his life he mainly devoted himself to the gratification of his social tastes and sensual instincts. He indulged in periodical drinking debauches, which were continued until his physical condition rebelled and compelled him to desist, and it was as the result of one of these that he seems to have died. There was no recognized female member of his household, even in the capacity of a servant. At the time of decedent's death the proponent was an unmarried woman about 22 years old, ostensibly residing with her mother in Auburn. She sustained no relations of kinship to the testator, but became acquainted with him in 1897 or 1898, and during the last years of her life was an undoubted, though surreptitious, member of his household for a considerable portion of the time, and upon one occasion accompanied him to a distant health resort under the guise of a daughter. He, in turn, supplied the money which enabled her to enjoy various trips and advantages. Without discussing it in detail, the evidence leaves no doubt in my mind, as it evidently did not in that of the learned surrogate, about the nature of the relations which existed between the two. The mother, Mrs. Bell, whether she originally procured them or not, unquestionably knew of, acquiesced in, and by her conduct permitted these relations. She attempted upon the trial to cloak them with the suggestion that her daughter was accustomed to act as secretary for the dead man, and also that upon his part there was desire for and contemplation of marriage. There is an abundance of proof, however, which demonstrates that they did not have for their end any such legitimate object as this, and that the only purpose of their maintenance must have been to secure as their price the Burtis property. It seems as if any doubt which any reasonable person might have about these relations would be dispelled by reading the evidence drawn from the mother herself, stating how, after having a Christmas dinner at the house of Burtis with him and her daughter, she drove back to Auburn just at night, leaving her daughter alone with him for three or four days. It is impossible to interpret this kind of thing as indicating, as suggested in the prevailing opinion, true regard by the man for the woman,

and a character upon the part of the mother and daughter which should place them above suspicion of plotting for the Burtis money and engineering fraudulent wills. It is urged that it is an imputation upon the good repute of this mother and daughter to approve the views held by the surrogate. That is probably so. But if, as it seems, the evidence shows beyond the possibility of reasonable doubt that one has encouraged and the other sustained improper relations with the testator for years, the denial of wrongdoing in connection with the alleged will must find other support than claims of general good character. And if these relations were maintained years without marriage, what was their object other than to secure money? The only question is whether the scheme has been made effective by the alleged will.

It was known that the deceased some time before his death had made a will in favor of his cousin, Elizabeth Cornell, now Scott. Soon after his death the proponent produced two purported wills— one, that which was offered for probate, dated May 26, 1902; and the second apparently executed October 23, 1901. The body of each was in the conceded handwriting of the testator, and each, in effect, was the duplicate of the other in giving all the testator's property to the proponent. The scene of the execution of each was laid in the house of proponent's mother. Except for one Marshall, a former servant of the deceased, and to whose position reference will be made hereafter, no one outside of the Bell family came in contact with the alleged execution of either instrument; Mrs. Bell and her daughter Mrs. Atkins being the alleged witnesses to the first one, and Mrs. Bell and Marshall the witnesses to the last one. In reaching a decision as to the validity of the purported will offered for probate, the respective parties and the surrogate have treated the earlier alleged will as an important feature, and manifestly this is so. If at that time Burtis did actually execute a will leaving all of his property to the proponent, it is certainly a very influential indication of his feeling and testamentary intentions towards her, and it is a foundation upon which properly may rest very beneficial inferences in her favor as one approaches the consideration of the purported will of the following May. Upon the other hand, if contestants have proved that this former instrument never was seriously regarded or intended by testator as a will, and that the purported execution by him is a fraud, then certainly they have demonstrated that Mrs. Bell and her daughter were possessed of a desire for the estate of Burtis which was not bounded by any scruples of conscience, and which would not be abandoned even if its fruition entailed the employment of criminal means. The claim of the contestants is that this first instrument was written out by the testator when he was somewhat under the influence of liquor, and that it was never intended to be, and never was in fact, executed by him; that at the time when it was claimed that it was executed and witnessed in Auburn by Mrs. Bell and her daughter Mrs. Atkins the latter was not there at all, but was in the city of Chicago. In determining the validity of this first will the counsel for proponent insists that great weight must be given to the fact

that the body of the instrument and the signature itself are in the conceded handwriting of the testator, and, inasmuch as the same thing is true of the handwriting in the body of the second will, that circumstance will be briefly discussed. It appears by the evidence of many witnesses, some of them called by the proponent herself, that it was not unusual for Burtis, especially after convivial drinking without extreme intoxication, to indulge in promises of generous gifts resting in future fulfillment. This was so habitual with him that those familiar with his ways attached no serious importance whatever to his promises. The witnesses Nino and Murphy, and proponent's witness Marshall and others, have fully described his characteristics in this respect, and the understanding upon their part that these bursts of generosity did not indicate any actual consummation. In the opportunity for influence furnished by his frequent fits of intoxication more or less complete, and in the disposition to indulge in these fits of inchoate generosity, might be found a sufficient explanation of the composition by Burtis of two unexecuted and ineffective wills. But in this case we can easily conceive of causes which might make indulgence in these forms more forced than spontaneous. If, under the controlling guidance of Mrs. Bell, she and her daughter were engaged in a scheme to procure the property of Burtis in return for the daughter's favors, it is not at all violent to presume that invitations were pressed upon the man to make property provision for the woman, which in no other way could be so peacefully and cheaply satisfied as by an appearance of intended compliance. Direct evidence is not wanting that he did thus temporize with their desires. The deposit by him in the bank of a package of securities with proponent's knowledge, marked with her name, but apparently under his control in the light of the advice given to him by the witness Fanning as to the ineffectiveness of such a purported gift, seems to indicate a willingness to trifle with this subject of giving away property. The witness Nino, who was for a long time his personal servant and attendant, and who, so far as one is able to discover, has no object in committing perjury, testified specifically upon this subject in connection with the first will. He says that one evening after a period of convivial drinking, while witness, proponent, and testator were alone at Springside, the latter wrote out and signed that instrument with remarks and signs to witness which fully indicated that he did not intend it as a serious document, but as a joke; that as a matter of fact, when a short time after witness put his employer to bed the paper was left unexecuted upon the table, from which it had next morning disappeared under circumstances which might readily account for its subsequent possession by proponent. So that while, under ordinary circumstances, the fact that the purported will was in the handwriting of the testator might be very significant as bearing upon its validity, and while that circumstance in the case is undoubtedly a subject for due consideration, I do not regard it as by any means controlling, or as outweighing the other testimony that neither instrument as a matter of fact was executed.

Much stress is laid upon the fact that the handwriting of Burtis is clear and firm and free from tremulousness, as indicating that he was not intoxicated when he wrote them. There is no evidence as to his condition when the last one was written, or that he was intoxicated to the extent of physical incapacity when the first one was written. The evidence shows over and over again that he possessed capacity to drink enough to bring on his fits of pseudo generosity without at all impairing his physical powers. Then, too, it is said that it would have been very immoral for Burtis to pretend to execute a will in favor of proponent without intent actually to do so, and in the meantime to maintain his relations with her; and there are suggestions—not warranted, as it seems to me, by the evidence—about debauching of a mere child. It may be conceded, so far as this case is concerned, that Burtis was not exemplary. But that does not lead to the other conclusion that the proponent and her mother were either innocent in their relations or duped by him. At the time of his death the proponent was about 22 years old, and there is no evidence of unworldly innocence upon the part of the mother. They knew whether he executed the will or not, and I fail to discover in the history of what took place at Springside any controlling moral reasons for diverting this estate to the proponent. It is not an uncommon history that illicit relations produce fraud, deception, and crime, and I do not believe that either the community or the courts have yet reached the point of making them an equitable basis for diverting a man's estate from his legal heirs.

The parties have offered some general observations as to the probability that the testator would have made and executed the second will if he had in fact executed the former one, making just the same disposition of his property as the later instrument. Mrs. Bell swears that the explanation of this lay in the desire to have his will written upon a blank form. It seems to us, however, that if he had executed the later instrument as a mere formal expression of his testamentary desires after executing the prior instrument, he would have been apt to take up and destroy the earlier one, which was thus superseded, and not leave them both outstanding in the possession of the proponent. There would be no excuse or reason for leaving them both with her. Upon this issue, however, general observations must yield to specific proofs. The parties have accepted and proceeded upon the theory that if Mrs. Atkins was present in Chicago at the date of the purported execution, then the instrument was not executed as claimed, but is fraudulent. Much testimony has been offered upon this point. A large part of it was heard and considered by the learned surrogate upon the production before him of the witnesses who gave it, but, as stated, considerable new evidence has been taken in Chicago since the case came upon appeal into this court. A careful review of all of this testimony does not create in my mind a disposition to reverse the conclusion adverse to proponent which the surrogate formed after listening to so many of the witnesses as were produced before him. If we leave out of account the question of Mrs. Atkins' absence

from Auburn, the evidence of the witness Nino read by itself, if true, makes it very improbable that the testator ever intended to or did execute this paper as his last will and testament and there are many reasons which persuade us to believe that the witness did tell the truth. Passing by his testimony, I believe that a fair preponderance of the remaining evidence warrants the conclusion that Mrs. Atkins was in Chicago, instead of Auburn, at the date involved.

It is proper to keep in mind certain facts undisputed, or overwhelmingly established by all of the evidence, as a basis by which to weigh other testimony of the witnesses. Mrs. Atkins was in Auburn in August, 1901, and again in the spring or summer of 1902. She and her family moved from one apartment house in Chicago to another in October, 1901. The household goods were moved into the latter apartment October 15th. The family did not move in until the afternoon or evening of October 19th. I speak of these details because I believe that what I regard as the inaccurate evidence of certain witnesses as to her absence from the Chicago flat after October 19th and her presence in Auburn during that time results from a confusion with the periods when she was absent from her Chicago flat prior to October 19th and was present in Auburn before and after October, 1901. While many of the witnesses sworn in behalf of proponent both from Chicago and Auburn to sustain the claim that Mrs. Atkins was in the latter city when the will was executed are subject to circumstances which discredit their testimony, others there were who undoubtedly intended to tell the truth, but who, without any adequate means of fixing dates, made errors in their testimony. Upon the other hand, there were various reliable book entries and other facts which strongly corroborate the evidence of contestant's witnesses as to the whereabouts of Mrs. Atkins, and I think that the evidence of the persons who roomed in Mrs. Bell's house at the time Mrs. Atkins was said to be staying there in October, 1901, that they neither saw nor heard of her, is especially convincing. I can understand how a witness with nothing to aid his memory might be mistaken in his recollection of the particular time two or three years past when he saw a certain person, but it seems to me quite improbable that witnesses of the class called by contestants should be mistaken in their positive testimony that they did not see or hear of a person in the same house with them for a long period of time covering the one in dispute. If Mrs. Atkins had been in the house, her presence would have been made manifest in some way to these people; and if they had seen her, or even heard of her being in the house with them, I do not believe that this fact would be so obliterated from their memory as to leave it blank upon that subject. It is perhaps not so trifling as to be unworthy of notice that Mrs. Bell herself, as we must assume after more or less consideration of this subject, fixed the date of her daughter's alleged arrival at Auburn in October, 1901, differently than did the daughter, and her version was subsequently overwhelmingly contradicted and abandoned by the other witnesses. Assuming an intention to be truthful, she furnish-

ed a significant illustration of the errors which may have crept into the testimony of proponent's witnesses upon this point.

Concluding, therefore, that the evidence produced before the surrogate warranted his decision that this instrument never was executed as claimed, and that the additional evidence presented to us does not seem to be sufficient to change the result arrived at by him, we come to the consideration of the instrument offered for probate. The evidence of the proponent is to the effect that this paper was written by Burtis at his home; that in the evening of the day in question he, with Marshall, came to Mrs. Bell's house, where the instrument was signed by the testator and acknowledged before and executed by Mrs. Bell and Marshall as witnesses. No outsider was present. In disputing the validity of this instrument and the genuineness of testator's purported signature, the contestants have largely, although not exclusively, by their witnesses urged the theory adopted by the surrogate of a double tracing, first from the name at the top of the will to an independent piece of paper and then from the latter to the signature at the bottom of the will. A great volume of evidence has been presented upon this question of the genuineness of the signature. Several professional experts of high standing have been sworn upon either side. In addition, a very large number of men experienced in the examination of signatures, such as bank officers, have been sworn upon each side. Many of those called in behalf of the contestants by actual experience during his life had become acquainted with the signature of Mr. Burtis. Many hundreds of exhibits of the signature were put in evidence. It is impossible in the most general way to even summarize all of this evidence so as to state all of the reasons found therein which, in my opinion, amply sustain the finding of fact made by the surrogate against the genuineness of the signature. The witnesses for the contestants have especially referred to four features which distinguish the disputed from the ordinary standard signature of Mr. Burtis, namely: (1) The difference in pen pressure or shading in letters, which in a general way in the genuine signature ordinarily commenced with the beginning of the downward stroke, and in the disputed is most apparent near the base line. (2) The manner in which lines in various letters, especially capitals, in the disputed signature, commence bluntly as from a point, instead of what might be called a "flying start," as is seen in the standard. (3) The difference in formation of particular letters in the disputed as compared with the standard signature. It may be mentioned as a very limited illustration of this that in an examination of between 1,300 and 1,400 signatures proponent's expert witness Hamilton only claims to have found a very few formations similar to that seen in the disputed signature of the well formed three-sided "r" in "Albert," of an initial "A" with a blunt closed top and a loop feature at the left of the stem of the close proximity of the letters "l" and "b" in "Albert," and of the stilted or long stem feature of the capital "G," and the blunt appearing stem of the capital "B." It is a matter of interest to compare the formation of the letter "r" referred to in "Albert" with the same letter in the word "Sarah"

of the witness Mrs. Bell. (4) The hesitation, change in direction, change in movement, and the tremulous, labored, halting, self-conscious general appearance of the disputed signature, as compared with the free, vigorous, and rapid appearance found in the genuine one. This last feature is especially noticeable to any one who examines the signatures and the enlarged photographs which have been used.

The theory of a tracing is sustained by a large number of point measurements showing an exact similarity between the name at the top of the will and the disputed one at the bottom, and also by superimposing the photograph of one over the other. It is urged that the doctrine of tracing and that of dissimilarity in letters do not go together. The evidence, however, of the witnesses Osborn and Truesdell, as well as of others, makes it very clear that an inexperienced person attempting to make a tracing of one signature over another would find the greatest difficulty in making all of the letters exactly coincide in all of their details, and that especially in a double tracing one would expect to find just such dissimilarities as have been pointed out between the disputed and the standard signatures. Moreover, it might very well happen that a person attempting to make a forgery in this manner, while preserving the general accuracy of the main features in the signature, would attempt to fill in parts of letters by a free-hand forgery which would result in dissimilarities. Upon the other side I am impressed that the proponent is constantly put in the attitude of explaining and apologizing for and defending the abnormal features and characteristics of the purported signature. Several of the semiprofessional experts called by her admit that the difference between it and the standard signatures is such as would have excited suspicion and exacted investigation before payment of a check. One of her most important and learned experts, Prof. Frazer, admitted that when, as the result of two or three weeks of investigation, he came to the conclusion that the signature was genuine, he was astonished that he did so come to it. His means of journeying thither was a subtle and refined theory of similarity in tremograms and serrations which was peculiarly his own, and which was bitterly attacked by the other experts. Another of proponent's important experts (Hamilton) admits that, if the signature is genuine, it is one "with abnormal features," and as the result of an infinite amount of pains and experimenting with pens and ink he is constrained to conclude that this signature could only be produced by a pen with one broken nib held between the first and second fingers at an unusual angle and passing slowly over the will when laid upon a book covered with a corrugated surface exact to the thousandth part of an inch, and using ink which could be most nearly reproduced by combining two different kinds, which, mixed up, were allowed to stand for a time with rusty pens thrown in. In addition to attempting to supply these unfavorable conditions as an excuse for what is seen, Mrs. Bell places the testator at the time of writing his signature in rather a low rocking chair. And so we find urged one theory that the slow and labored appearance of the signature is due to the extreme

care which the testator may have been supposed to exercise in signing so important a document, and another one that he was so indifferent that he wrote it under all the adverse conditions which could well be imagined. The attempt also is made to sustain the validity of the signature by showing that the interlined words "I give" in the body of the will were written in the same ink as the signatures of the testator and witnesses, and which was different from that used in the remaining body of the instrument, the inference urged being that the genuineness of the interlined words and of the witnesses' signatures create a presumption in favor of the genuineness of the testator's signature if made at the same time. The evidence of proponent's witness Frazer, however, shows that this claim of similarity of ink is not at all reliable, and he further shatters the proposition that the interlined words, the testator's signature, and the witnesses' signatures were all written at the same time at Mrs. Bell's house by stating that, so far as his experiments show anything, they show that three different kinds of ink were used, one for each. Moreover, I think that the interlined words display a characteristically free and easy style of writing, which strongly rebuts the claim that at the same time the writer produced the halting and deformed signature in dispute.

Upon the trial the parties attempted to fortify their respective positions with reference to the signature by various corroborative lines of proof. There were alleged statements by the testator upon the one side that he had willed or was going to will his property to Miss Burgess, and upon the other, in effect, contradicting any such act or intention. There was evidence by several witnesses tending to show that the witness Marshall, upon the evening of the purported execution of the will, was not in Auburn at all, but in Springside. And there were alleged admissions by him to various reputable witnesses utterly at variance with the fact that he had witnessed this will. And still further his reputation was directly impeached by witnesses sworn for that purpose, and to all of which he attempted to reply by the sustaining evidence of himself and others. In addition to the package of securities already referred to, which, if a valid gift, gives her about $60,000, proponent claims to possess two notes made by testator, one dated May 12, 1899, for $1,000, and another dated February 4, 1903, for $10,000, and it is urged that these—especially the last—are not consistent with the existence of a prior will giving all of the maker's property to the payee. In addition, we have the significant fact that the proponent did not offer herself as a witness to explain and fortify many things which lay within her personal knowledge. It is hardly an answer to say that she would have been disqualified and prevented from testifying to many things. Even if it be assumed that this objection would have been made at various points, we think there were others at which she could not have been stopped from strengthening her case if true.

But it is not necessary to go this length in order to affirm the decision of the surrogate. The proponent offered the will for

probate, and the burden rested upon her of establishing by a preponderance of evidence that it was legally executed, and was not a forgery and a fraud. If she has failed to meet this burden, and has left the solution of the question upon evenly balanced testimony, she must fail. Matter of Will of Cottrell, 95 N. Y. 329, 335; Rollwagen v. Rollwagen, 63 N. Y. 504, 517. But it is urged, and the majority of this court seems to hold, that a different rule applies to the consideration of this appeal upon the facts from that which would govern the disposition of a similar appeal from the decision of another tribunal upon such an issue, and it is said:

"If  *  *  *  it appears that the disposition of the questions of fact raised by the evidence is not free from doubt, and the surrogate's decision is not entirely satisfactory, the questions of fact will be sent to a jury for determination."

It is difficult to determine just what significance is given in the controlling opinion to the qualification that the surrogate's decision must be "entirely satisfactory." If this rule means that every surrogate's decision will be reversed where either the evidence fails to make a mathematical demonstration free from all doubt, or the appellate court does not like the effects of the decision, then it is an imposition upon litigants to require them to waste time and money in trying their cases in Surrogate's Court; for it is almost impossible to conceive of any disposition of a question of undue influence, testamentary capacity, or forgery which would comply with these requirements. The more severely contested, and the longer and the more burdensome in expense any contest was in Surrogate's Court, the more certain it would be under this rule that time and money were being wasted, and that the decree of the surrogate would be reversed, and a new trial ordered. The case of Matter of Lansing, 2 N. Y. Supp. 117, cited with approval in the learned prevailing opinion, would almost seem to imply that this was the rule therein contended for, because the opinion in that case states, "It is our duty to examine the case de novo, and unless we are satisfied that the probate should be granted, and have no doubt on that point, we should reverse the decree, and order issues to be tried." It does not seem to me that either common sense, the statutes, or the decisions sustain any such rule, or require a reversal of the decree involved. It is to be noticed that, as we read it, the prevailing opinion nowhere argues that the findings of the surrogate were against the weight of evidence, but simply reiterates the idea that the evidence did not settle the issues beyond any doubt or question. There is nothing in the statutes relating to the consideration of appeals from Surrogate's Court which in terms lays down any such rule as the one suggested, and it seems to me that the well-considered cases, several of them decided by this department, which ought to be binding upon us, have applied this principle of reversing a surrogate's decree and ordering a new trial only where the evidence presented unusual features which weighed against the decision rendered, or was such as to make the appellate court in a legal sense dissatisfied with the decision rendered because the

evidence did not satisfy them of its correctness but preponderated against it.

In Howland v. Taylor et al., 53 N. Y. 627 (cited as an authority for the Lansing Case, referred to supra), the surrogate had admitted a will against the claim of forgery, and in a brief memorandum the court held that, while the facts appearing were not sufficient to satisfy them that the will was a forgery, yet they were not sufficient to convince them of its genuineness, leaving the matter in doubt and uncertainty. That was a perfectly natural and sensible decision. The burden rested upon the proponent to establish that the will was properly executed, and not a forgery; and, if the evidence failed to meet that burden and satisfy the court by a fair preponderance that the decision was correct, it was its duty to reverse it upon the facts under the ordinary principles applicable to the consideration of an appeal upon questions of fact.

In Matter of Brunor, 21 App. Div. 259, 47 N. Y. Supp. 681, cited in the prevailing opinion, a decree had been made admitting a will to probate over various objections. The court starts out with the language, "In many respects the case presents unusual and remarkable features, to which we may briefly refer," and then concludes that the proponent had so far failed to sustain the burden resting upon him as to leave the questions in doubt and a new trial was ordered.

In Matter of Dixon, 42 App. Div. 481, 59 N. Y. Supp. 421, the decree appealed from again had admitted the will to probate. Mr. Justice Hardin, in writing the opinion, takes occasion, after a review of the facts, to expressly state that the evidence given by the lawyer who drafted the will and the testimony of the physician and attendants, who were the material witnesses for the proponent, "leave much doubt in the mind as to whether the will was the product of an independent, intelligent understanding." Again, it is evident that the court felt that the proponent had failed to meet the burden of proof, but had left the issues in evenly balanced doubt, which of necessity required a rejection of the probate and the reversal of the decree.

The case of Matter of Tompkins, 69 App. Div. 474, 74 N. Y. Supp. 1002, contains a very brief opinion, which is predicated upon cases already referred to, and needs no particular comment.

The case of Matter of McGraw, 9 App. Div. 372, 41 N. Y. Supp. 481, was decided by this department, and the surrogate had refused to admit a will to probate because of alleged lack of testamentary capacity. The case was decided by a divided vote, and the majority concurred in the opinion that upon the substantial question involved, "that the decedent was not of sound mind, we fail to discover sufficient evidence to sustain this proposition; not an irrational act or word on the part of the deceased in connection with this whole affair appears in the evidence."

In Matter of Shannon, 11 App. Div. 581, 42 N. Y. Supp. 670 (decided by this department), the surrogate decided that a certain codicil was null and void, and this part of his decree was under consid-

eration upon the appeal. In reversing it and ordering a new trial before a jury, the court says:

"A full consideration of all the evidence disclosed in the appeal book leaves an impression that the bequest to the Dundee Baptist Church was not induced by improper influences, and that the finding of the surrogate to the effect that the bequest * * * was the result of fraudulent practices, amounting to undue influence, is of doubtful propriety."

And further:

"We are not satisfied with the finding made by the surrogate that the bequest * * * was induced by undue influence, and we must therefore direct the issues, as settled, to be tried at a Trial Term."

This opinion is significant as indicating the belief of the court that the decree was against the weight of evidence, and that the meaning of the words "not satisfied with" a decree in such a case is intended to define the feeling that it is unsatisfactory because against the weight of evidence."

In Matter of Van Dawalker, 63 App. Div. 550, 71 N. Y. Supp. 705, decided by this department upon the opinion of Mr. Justice Williams, it appeared that the surrogate had at first admitted the will to probate, and that then, opening the case for more evidence, he had reversed his first decision. The court, in reversing his last decision and ordering a new trial before a jury, says:

"We are of the opinion that the evidence so received was incompetent, and * * * was not of sufficient importance to justify the surrogate in changing his former opinion and refusing probate to the will."

And again:

"Moreover, we are unable to see how these admissions or declarations could have induced the surrogate to change his well-considered decision already made. They were at best the opinions of nonexperts, * * * and ought not to have outweighed the considerations referred to in the surrogate's opinion already handed down."

In Matter of Rayner, 93 App. Div. 114, 87 N. Y. Supp. 23, decided by this department, where the surrogate had refused to admit a will to probate, the court says, "The testimony of Dr. York, her attending physician, does not seriously impugn her testamentary capacity;" and, inasmuch as reliance was placed upon his testimony to accomplish this result, the court held that there was sufficient doubt about the correctness of the decision so that a new trial ought to be granted.

In Matter of Laudy, 148 N. Y. 403, 42 N. E. 1061, an appeal was taken from a judgment upon the decision of the General Term which reversed a decree of the surrogate which refused probate to a will. The court, in passing upon the powers of the appellate court, under section 2586 of the Code, says:

"That court is given broad powers under the provisions of the Code referred to, and in the exercise of its sound judgment and discretion may reverse in case it becomes satisfied that substantial justice has not been done."

The rule thus enunciated seems to me to be about the same one which is applicable in other cases, and not to sustain the rule formulated in this case. I do not overlook the fact that the attempt is

made to escape from an interpretation of the rule as meaning that there should be a reversal unless the evidence practically amounts to a conclusive demonstration. But a consideration of the entire opinion seems to oppose the qualification thus attempted to be made, because the review of the evidence each time simply leads up to the proposition that some question is left "in doubt."

As an aid to the practical consideration and interpretation of the principles to be applied to the decision of this case, it might well be asked whether it is probable that any doubts now existing will be more satisfactorily eliminated when the parties have spent a great amount of time and money in resubmitting the evidence which fills 1,000 pages, and exhibits which number in the neighborhood of 2,000, to the necessarily cursory and limited consideration of a jury. It is possible that upon such retrial before a jury a fuller opportunity will be given for magnifying extraneous considerations and urging alleged equitable considerations than upon the former hearing, but it is practically impossible that a jury, within the time and methods at their disposal, should be able to give to the study of the legal evidence and exhibits the painstaking care and consideration which were manifestly given by the surrogate.

The decree should be affirmed.